[No. S004722. Crim. No. 25642. May 2, 1991.]

THE PEOPLE, Plaintiff and Respondent, v.
RONALD LEE DEERE, Defendant and Appellant.

706

**COUNSEL**

Robert R. Bryan, under appointment by the Supreme Court, and Thomas W. Jackson for Defendant and Appellant.

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, Richard B. Iglehart, Chief Assistant Attorney General, Jay M. Bloom and Frederick R. Millar, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

Kent S. Scheidegger and Charles L. Hobson as Amici Curiae on behalf of Plaintiff and Respondent.

**OPINION**

**ARABIAN, J.**—Defendant Ronald Lee Deere was convicted of one count of first degree murder and two counts of second degree murder, accompanied by a finding of a multiple-murder special circumstance (Pen. Code,

§ 190.2, subd. (a)(3)).[1] The penalty was fixed at death. The penalty judgment was subsequently reversed by this court in *People* v. *Deere* (1985) 41 Cal.3d 353 [222 Cal.Rptr. 13, 710 P.2d 925] (*Deere I*). Following a remand for retrial of the penalty phase, the sentence was again fixed at death. This appeal is automatic. (§ 1239, subd. (b).)

I.

### FACTUAL AND PROCEDURAL BACKGROUND

Because defendant does not deny responsibility for the three killings, we need not dwell unduly on the evidence linking him to the crimes. Apparently despondent over the termination of his relationship with Cindy Gleason, defendant shot and killed the husband and two young children of Ms. Gleason's sister, Kathy Davis. Defendant had previously threatened to kill "everyone" in Ms. Gleason's family if she stopped seeing him. Shortly before the killings, Ms. Gleason received a telephone call from defendant telling her that "I'm not going to be responsible for what I do today." Later that night, Ms. Gleason and Ms. Davis discovered the bodies of Don, Michelle and Melissa Davis in Don's trailer. Defendant fled and hid from the police; he was arrested several days later. (*Deere I, supra,* 41 Cal.3d at p. 357.)

Defendant initially pleaded not guilty but later moved to withdraw his plea. The trial court appointed a psychiatrist, Dr. Tommy Bolger, to examine him. Following the examination and a report confirming defendant's competence, the court found defendant competent to plead guilty, waive jury trial and cooperate with counsel in the event his plea was withdrawn. The court then permitted defendant to withdraw his plea of not guilty, waive his rights, and plead guilty to each count and admit the special circumstance allegation. His counsel concurred in the change of plea. Based on the transcript of the preliminary hearing, the court then found defendant guilty of one count of first degree murder in the killing of Don Davis, and two counts of second degree murder in the killings of Michelle and Melissa Davis. The court also found true the multiple-murder special-circumstance allegation. (*Deere I, supra,* 41 Cal.3d at p. 357.)

Thereafter, defendant also waived jury on the penalty issue. Pursuant to stipulation, the court considered the testimony at the preliminary hearing and an earlier hearing to suppress evidence. While defendant offered no mitigating evidence, he made a brief statement voicing remorse for his crimes and announcing that he deserved to die. Counsel argued that the

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

aggravating circumstances did not outweigh those in mitigation and therefore that the penalty should not be death. (*Deere I, supra*, 41 Cal.3d at p. 357.)

Counsel also explained to the court the reasons which impelled him to agree to the guilty plea, the waiver of jury trial and the failure to offer mitigating evidence. According to counsel, he argued with defendant over each of these decisions, but ultimately grew to appreciate and concur in his client's point of view. Defendant, counsel explained, believed that to call mitigating witnesses would " 'cheapen' " his relationship with his family and remove " 'the last vestige of dignity he has.' " The decision not to offer evidence, counsel stated, was " 'made . . . in close consultation with [defendant]. It has been based on his desires and my conclusion that I have no right whatsoever to infringe upon his decisions about his own life.' " (*Deere I, supra*, 41 Cal.3d at p. 361, italics omitted.)

In his first appeal (*Deere I, supra*, 41 Cal.3d 353), defendant claimed, inter alia, that counsel had been deficient in failing to offer any evidence in mitigation during the penalty phase apart from defendant's testimony at the preliminary hearing. A majority of this court agreed, holding that a defense counsel's failure to present any mitigating evidence in the penalty phase of a capital trial deprives the defendant of effective assistance of counsel. (*Id.* at pp. 362-368.) The judgment was, accordingly, reversed as to penalty, but affirmed in all other respects. (*Id.* at p. 368.)[2]

At the penalty retrial (to be discussed more fully below) defendant again waived jury trial. The prosecution offered no evidence in aggravation beyond that already presented at the first trial. Defense counsel, at defendant's insistence, failed to present any mitigating evidence apart from certain testimony at the preliminary hearing. The trial court, in response, held counsel in contempt for refusing to obey its order to present any available mitigating evidence, in conformity with this court's decision in *Deere I*. It then reviewed the evidence in aggravation and sentenced defendant to death. The court subsequently reversed the order of contempt, stayed the sentence of death, appointed an independent investigator and attorney to investigate and present a case in mitigation, and reopened the penalty hearing for the presentation of mitigating evidence. Thereafter the court resentenced defendant to death.

---

[2]The majority opinion in *Deere I, supra*, 41 Cal.3d 353, was authored by Justice Mosk. Chief Justice Bird and Justices Reynoso and Kaus concurred in the majority opinion. Justice Broussard authored a separate concurring opinion in which Justice Grodin joined. Justice Broussard concluded that the failure to offer any mitigating evidence required reversal, not because counsel had failed to fulfill his obligations to his client, but rather because the omission of such evidence rendered the verdict constitutionally unreliable. (41 Cal.3d at pp. 368-370.) Justice Lucas dissented.

## II.

## DISCUSSION

### A. *Ineffective Assistance of Counsel*

Defendant contends his attorney rendered ineffective assistance of counsel at both the guilt and penalty phases in several respects relating to claims of mental incompetence, as well as in failing to present evidence in mitigation at the penalty phase.[3] The contentions lack merit.

Defendant first asserts that counsel was deficient at the guilt phase in failing to investigate and present evidence of diminished capacity, and in permitting defendant to plead guilty and waive a jury notwithstanding defendant's alleged incompetence. ■ Claims of ineffective assistance at the guilt phase of trial, however, may not be raised in this appeal. Contentions relating to the guilt phase were considered and rejected by this court in defendant's first appeal. (*Deere I, supra,* 41 Cal.3d at pp. 357-359.) Although the judgment was reversed as to penalty, it was "affirmed in all other respects." (*Id.* at p. 368.) Thus, only errors relating to the penalty phase retrial may be considered in this subsequent appeal. (*People* v. *Durbin* (1966) 64 Cal.2d 474, 477 [50 Cal.Rptr. 657, 413 P.2d 433]; *People* v. *Smyers* (1969) 2 Cal.App.3d 666, 668 [83 Cal.Rptr. 3].)

■ Defendant next asserts that counsel was deficient at the penalty phase retrial in failing to raise the issues of defendant's mental competence to stand trial and waive a jury. Defendant cites no evidence from the record of the penalty retrial to support the claim. Instead, he refers to the preliminary hearing testimony of his former girlfriend, Cindy Gleason, and her sister, Kathy Davis, indicating that at the time of the murders defendant was despondent over his impending breakup with Ms. Gleason. The latter testified that defendant had a habit of cutting himself with razor blades whenever she threatened to leave. Two days before the murders, according to Ms. Davis, defendant went to her apartment with a cut on his arm, which she treated. Defendant then asked her to kill him. When she refused, he replied, "I knew you wouldn't do it. Never mind." Ms. Davis stated that defendant then told her that he was going to do something for which she would "hate him," but "he wouldn't be around for me to hate so not to worry about it."

---

[3] Defendant's briefing of this issue is somewhat confusing and disorganized. The first point heading in his brief lists six separate claims of ineffective assistance, but the discussion contains no subparts and fails to keep the claims distinct. The second issue on appeal overlaps with the first. For the sake of clarity, we have reorganized and consolidated defendant's arguments.

None of the foregoing evidence indicated a lack of competence to waive a jury and stand trial at the time of the penalty retrial. Indeed, in *Deere I* this court specifically rejected a claim, based on the *same evidence*, that the trial court erred in failing to conduct a competency hearing sua sponte at the guilt phase. (41 Cal.3d at pp. 357-359.) Moreover, nothing at the penalty retrial suggested that the state of defendant's mental competence had changed for the worse. Indeed, the trial court inquired of defendant directly on several occasions whether he wished to waive his right to a jury trial. In each instance, defendant responded clearly and unequivocally that he did. The trial court also observed for the record that defendant appeared to be rational and intelligent. Thus, there is no merit to defendant's claim that counsel was deficient in failing to raise the issue of defendant's competence at the penalty retrial.

 Finally, defendant contends that counsel rendered ineffective assistance in failing to present evidence in mitigation. The claim is totally without merit, if not specious.

As noted earlier, we held in *Deere I*, *supra*, 41 Cal.3d 353, that defendant was denied adequate representation at the penalty phase as a result of counsel's failure to present evidence in mitigation, notwithstanding defendant's unequivocal desire that no such evidence be presented. Defendant was represented at the penalty retrial by the same deputy public defender who had appeared on his behalf at the first trial. Defendant's views with respect to the presentation of mitigating evidence also remained unchanged; defendant was adamant, in counsel's words, that "[h]e does not want any evidence presented on his behalf because in his heart that is his private life and to bring that evidence into court would violate his relationships with everybody he holds dear and respects in this world. And to him, those relationships are more important than anything else, including his life."

Thus, counsel was confronted with the unenviable and wrenching choice of obeying the law as defined by this court in *Deere I*, or honoring his client's deeply held convictions. To make the dilemma even more acute, the trial court ordered counsel to present whatever mitigating evidence was available in accordance with our decision, or be held in contempt.

Forced to choose between the Scylla of his duty to his client and the Charybdis of his obligation to the law, counsel chose his client. As he explained: ". . . I think I am obligated to argue for [defendant] in this situation. If the Court—if I were to follow the Court's order and present mitigating evidence, assuming for the purpose of argument it is available, [defendant] would object to the very depth of his soul. He's told me that. I know he would do that." Counsel explained that his client's clear and

unequivocal wishes simply left him no choice: "I feel under the unique circumstances of this case I must make this decision . . . . [Defendant] has never once altered his position . . . . [¶] His position today is the same as it was the first day I met him. And although we argued vigorously on many occasions concerning what we should do in this case, . . . slowly but surely he convinced me his position is the correct one. He's made his decisions consciously, temperately, and not in the heat of passion, but based on his true and sincere and honest beliefs about what is right for him. I stand with him 100 percent. And to accede to the Court's order to either offer mitigating evidence or state for the record that there is none available would be the most gross conflict of interest I can imagine for an attorney in a case like this. So I cannot do it. [¶] I hope the Court doesn't feel that denial is contemptuous, but if the Court sees it that way, so be it."

Thus, under severe legal constraints, and at personal risk, counsel courageously performed the duty owed to his client. The trial court, as it had warned, thereupon held counsel in contempt for wilful failure to comply with its order. The court then weighed the evidence before it, found that the aggravating outweighed the mitigating circumstances, and sentenced defendant to death. Subsequently, however, the court stayed the sentence for the purpose of obtaining additional mitigating evidence and set a new hearing date some two months hence. At the same time, the court authorized Richard Welby, a licensed, experienced private investigator, "to contact, evaluate, and investigate the presence of mitigating evidence available from [defendant's] relatives, school teachers, employers, friends, and any other reasonable source." Shortly thereafter, the court also appointed an additional attorney, Jonathan Landau, to present the case in mitigation.[4]

At the continued hearing, the prosecution presented no additional evidence. Defense counsel reiterated that it was defendant's desire not to present any mitigating evidence. Thereafter, defendant, through Attorney Landau, presented six witnesses in mitigation. Dr. Bolger, a practicing psychiatrist with extensive experience treating prisoners at San Quentin and Soledad Prisons, testified that he had interviewed defendant shortly after his arrest. He stated that he believed defendant was an alcoholic and a drug addict, and that he was under the influence of alcohol or drugs at the time of the offense. Defendant's actions, in Dr. Bolger's estimation, were not premeditated, but rather constituted a "rage reaction" resulting from both stress and drugs. Based on his experience, Dr. Bolger believed that there

---

[4]Several weeks later, this court, having received a copy of the new commitment and judgment of death, ordered the clerk to strike the filing of the commitment and judgment and return the matter to the superior court for further proceedings. The trial court later withdrew its finding of contempt against the public defender's office.

was a "good probability" defendant could be of benefit to himself and society if allowed to continue in prison for life.

Richard Welby, defendant's court-appointed investigator, testified that he interviewed many people concerning defendant, and that while most were ambivalent, he gained the clear impression that defendant cared deeply for his mother and father. A neighbor, Wilma Garrison, testified that defendant had performed conscientiously in helping her remove some trees from her yard. Eunice Deere and Karen Sue Parker, defendant's sisters, both testified that defendant was upset at the time of the murder because of a deteriorating relationship with his girlfriend, that he had been a protective brother, that they had never known him to be violent, and that he loved his daughter. Finally, defendant's mother took the stand and testified that she loved her son and wanted him to live.

Attorney Landau also introduced into evidence an example of defendant's art work, which he had obtained from defense counsel pursuant to a subpoena duces tecum. In argument, Landau stressed defendant's artistic talent and the work he could accomplish in prison if his life were spared. Defense counsel also argued in favor of life, stressing the absence—in his view—of aggravating circumstances, and the psychological stress that defendant was under at the time of the offenses.

In light of the foregoing, we find defendant's assertion that he was denied effective assistance of counsel to be totally without merit. First, the record clearly indicates that a credible case in mitigation was presented, albeit by Attorney Landau rather than by appointed counsel. Defendant complains that Mr. Landau was acting as a "neutral" party, rather than as an advocate for defendant. However, defendant cites no evidence that Mr. Landau's presentation of the case in mitigation was anything less than zealous; indeed, the record clearly demonstrates otherwise. Moreover, the expedient of appointing secondary counsel in these circumstances did not originate with the trial court but was suggested in *Deere I* in a concurring opinion by Justice Broussard in which Justice Grodin joined. (41 Cal.3d at p. 369 ["Alternatively, the court could call persons with mitigating evidence as its own witnesses, or appoint new counsel to call them, and thereby place on the record the mitigating evidence essential to a careful, balanced penalty determination."].) Under the circumstances, we conclude that the appointment of Mr. Landau and his presentation of mitigating evidence cannot be faulted in any respect.

Furthermore, decisions subsequent to the instant penalty retrial have largely undermined the court's holding in *Deere I*. ■ As explained in *People* v. *Bloom* (1989) 48 Cal.3d 1194 [259 Cal.Rptr. 669, 774 P.2d 698]),

which held that a sentence of death was not constitutionally unreliable merely because a self-represented defendant chose not to present mitigating evidence at the penalty phase: "To the extent that *Deere, supra,* 41 Cal.3d 353, suggests that failure to present mitigating evidence in and of itself is sufficient to make a death judgment unreliable, *it is based on a mistaken understanding of the Eighth Amendment's reliability requirement and its reasoning in that regard is hereby disapproved.*" (*Id.* at p. 1228, fn. 9, italics added.) Rather, "the required reliability is attained when the prosecution has discharged its burden of proof at the guilt and penalty phases pursuant to the rules of evidence and within the guidelines of a constitutional death penalty statute, the death verdict has been returned under proper instructions and procedures, and the trier of penalty has duly considered the relevant mitigating evidence, if any, which the defendant has chosen to present." (*Id.* at p. 1228.)

We further underscored our disapproval of *Deere I* in *People v. Lang* (1989) 49 Cal.3d 991 [264 Cal.Rptr. 386, 782 P.2d 627]: "*Deere* was disapproved [in *People v. Bloom*] to the extent it suggests that a defendant's failure to present mitigating evidence, in and of itself, is sufficient to make a judgment of death constitutionally unreliable." (*Id.* at p. 1030.) Indeed, *Lang* went on to reject explicitly the proposition that "defense counsel should be forced to present mitigating evidence over the defendant's objection," noting that it contravenes the attorney's "paramount duty of loyalty to the client," undermines "the trust, essential for effective representation, existing between attorney and client," and ultimately reduces the quality of that representation by forcing defendants "who otherwise would not have done so to exercise their Sixth Amendment right of self-representation . . . . in order to retain control over the presentation of evidence at the penalty phase . . . ." (*Id.* at pp. 1030-1031.)

Finally, as further noted in *People v. Lang,* a defendant who insists that mitigating evidence not be presented at the penalty phase is estopped from later claiming ineffective assistance based on counsel's acquiescence in his wishes. "The invited-error doctrine operates, in particular, to estop a defendant claiming ineffective assistance of counsel based on counsel's acts or omissions in conformance with the defendant's own requests." (49 Cal.3d at p. 1032, fn. omitted.)

■ For all of the foregoing reasons, therefore, we conclude that defendant was not denied the effective assistance of counsel.

B. *Inquiry Into Mental Competence*

■ Defendant contends the trial court erroneously failed to inquire sua sponte into defendant's mental competence to stand trial.

As noted in the preceding section, defendant cites no persuasive evidence of incompetence at the penalty retrial. When called by Attorney Landau to present evidence in mitigation, Dr. Bolger testified that defendant appeared to have been on drugs and depressed at the time of the offenses. Defendant's sisters corroborated defendant's depressed state of mind during the period preceding the murders. None of this evidence reflects, however, on defendant's competence at the time of the penalty retrial. Moreover, as we observed in *Deere I*, defendant's opposition to the presentation of mitigating evidence "does not necessarily demonstrate an incompetence to stand trial or to plead guilty." (41 Cal.3d at p. 359.)

Defendant also purports to rely on "[e]xtensive evidence before the court in advance of trial," by which he means evidence of incompetence allegedly adduced during the preliminary hearing and the guilt phase. As explained earlier, however, defendant overlooks the fact that this court in *Deere I* rejected the contention that the court erred in failing to hold a competence hearing pursuant to section 1368. Dr. Bolger had testified at trial that defendant was mentally competent, "cooperative," "stable" in mood, possessed a "high normal" IQ, and displayed "excellent" judgment as revealed by verbal testing. (41 Cal.3d at p. 358.) The trial court ruled there was no evidence or any "possible grounds" for convening a formal competence hearing. (*Id.* at p. 359.) Hence, we held the trial court did not err in failing to order a competence hearing sua sponte. (*Ibid.*)

Contrary to defendant's contention, therefore, the record affords no basis to conclude that the trial court here erred in failing to order a competence hearing sua sponte.

### C. *Penalty Determination*

■ Relying on the seminal cases of *Gregg* v. *Georgia* (1976) 428 U.S. 153 [49 L.Ed.2d 859, 96 S.Ct. 2909] and *Woodson* v. *North Carolina* (1976) 428 U.S. 280, 303 [49 L.Ed.2d 944, 960, 96 S.Ct. 2978], which require "objective standards to guide, regularize and make rationally reviewable the process for imposing a sentence of death," defendant contends that the record is "ambiguous" as to the standards which the trial court applied in determining the penalty, and thus that the sentence is constitutionally unreliable.

The record rebuts the contention. The court prefaced its sentencing decision by observing: "I have followed all the laws that apply to this," and specifically mentioned CALJIC Nos. 8.84 and 8.84.1. The court added: "And, of course, I've read all the rest of them." Defendant claims that the latter remark injected a fatal ambiguity into the proceedings. On the con-

trary, it is clear that the court was referring to all the rest of the instructions and statutes applicable to the penalty determination in a capital case. There was no ambiguity, or any evidence of arbitrary or capricious action.

Indeed, following these remarks, the court proceeded with a careful and detailed analysis of the evidence relevant to the penalty determination, with specific reference to the statutory mitigating and aggravating factors. At the same time, the court also made clear that it understood its sentencing decision was not to be based upon any mechanical counting of factors or "mathematical formula." Although too lengthy and detailed to quote in full, the court's discussion focused on the circumstances of the crime, involving two young, vulnerable children; the evidence of planning; and the cold-blooded brutality of the killings. The court also reviewed Dr. Bolger's testimony and the evidence relating to defendant's state of mind at the time of the offenses, concluding that there was no doubt defendant was sane and under full "self-control." In mitigation, the court noted the absence of any prior crimes of violence, defendant's emotional distress stemming from a dispute with his girlfriend, the fact that defendant was "an intelligent man with great creativity," and the apparent affection existing between defendant and his family.

In sum, the record leaves no doubt that the court's sentencing decision was guided by clear and proper standards.

Defendant also claims that the trial court's decision may have been based upon evidence outside the record. Defendant refers in this regard to a brief, albeit somewhat cryptic, remark by the judge to the effect: "I think [defendant's] father talked to him about it [i.e., the murders]. I don't think [defendant] knows that I know as much as I do about this case." Nothing in the immediate context of the remark or in the record as a whole sheds any light as to the court's meaning. However, it is apparent, from the context of the court's sentencing decision as a whole, that this oblique statement played no part whatsoever in its penalty determination.

Finally, defendant asserts that a consideration of his future "dangerousness" improperly entered into the court's decision, in violation of *People v. Murtishaw* (1981) 29 Cal.3d 733, 767 [175 Cal.Rptr. 738, 631 P.2d 446]. On the contrary, the record makes clear that future dangerousness played no role in the court's decision. Indeed, the trial court affirmed that it did not consider defendant's possible future behavior to be a factor in aggravation, stating: "I am not saying that he would be dangerous if we let him go . . . . I'm not so sure I could make any ruling based on that." The court then

observed that the aggravating circumstances to which it had previously referred are what "really control."[5]

Accordingly, we find no error.

### D. *Matters Off the Record*

Defendant next asserts that the judgment must be reversed because the trial court allegedly conducted certain proceedings off the record, in violation of section 190.9. The contention lacks merit.

Section 190.9 requires that "all proceedings" in capital cases "shall be conducted on the record with a court reporter present." The statute does not define "proceedings," and no decision has addressed its meaning in the capital context. Nor is case law in other areas especially helpful. In *Lister* v. *Superior Court* (1979) 98 Cal.App.3d 64 [159 Cal.Rptr. 280], for example, the court concluded that a "proceeding" refers to "something done or to be done in a court of justice or before a judicial officer," and thus held that a jury questionnaire did not constitute part of the proceedings of the court so as to subject a responding party to contempt under Code of Civil Procedure section 1209. (98 Cal.App.3d at p. 70.) In *People* v. *Gutierrez* (1986) 177 Cal.App.3d 92 [222 Cal.Rptr. 699], the court adopted a similar definition, holding that the term, as used in article I, section 14 of the California Constitution (requiring an interpreter for criminal defendants "throughout the proceedings") "is limited to a proceeding held before a judicial tribunal." (177 Cal.App.3d at p. 100.) Thus, the court concluded that the section did not apply to an interview by a probation officer preparing a presentence report.

Unfortunately, these definitions—which limit the term "proceeding" to official court business conducted before a judicial officer—tend to be circular where the question is precisely whether certain actions which are not reported constitute formal judicial transactions. Such semantic difficulties need not long detain us, however, for nothing which assertedly occurred off the record here could possibly have affected the verdict.

■ Defendant cites three alleged instances of nonreported proceedings. First, he refers to the appointment of Richard Welby as the investigator and Jonathan Landau as the attorney assigned to investigate and present a case

---

[5] The court's full statement in this regard was as follows: "It took a lot of guts for [defendant] to do this. I am not saying that he would be dangerous if we let him go. I'm not saying that somehow or other he might get out. If he got out he'd be dangerous. I'm not so sure I could make any ruling based on that. What I'm talking about is aggravating circumstances. I've just about said what the aggravating circumstances are that really control."

in mitigation on behalf of defendant. Both appointments, however, were a matter of record. Whether anything took place off the record in connection with the appointments is purely a matter of speculation, and any evidence of such activity must, of course, be presented by means of a petition for habeas corpus. (*People* v. *Szeto* (1981) 29 Cal.3d 20, 35 [171 Cal.Rptr. 652, 623 P.2d 213].)[6]

■ Next, defendant cites a statement by the trial court to defense counsel explaining its plan for the presentation of mitigating evidence during the completion of the penalty phase. As the court explained: "My position on this matter is to make certain, Mr. Jones, that we get evidence in here as requested by Justice Mosk, having to do with the evidence needed on the mitigating circumstances, and if you read his opinion—I'm sure you did— he was explicit about it; absolutely clear . . . . I am not going to play an active part in the rest of this trial so far as getting witnesses in here or anything of that nature. In fact, I haven't at all. I'm sure you're aware of the appointments I have made. I think it's something that does not reduce your responsibility . . . . But, as I understand the situation, we have been mighty successful with [defendant's] family. I have contacted them directly and a number of other people would be happy to testify the way Justice Mosk wants them to testify."

Based on the foregoing, defendant asserts that the trial court "apparently" contacted witnesses off the record; he argues that the situation is analogous to a juror conducting an independent investigation of the case, and is thus presumptively prejudicial. (*People* v. *Honeycutt* (1977) 20 Cal.3d 150, 156 [141 Cal.Rptr. 698, 570 P.2d 1050].) The analogy does not hold. The presumption of prejudice in the juror context arises, in part, because neither court nor counsel is generally aware of the outside contact, its results or its effect on the case. (*Id.* at pp. 156-157; *People* v. *Conkling* (1896) 111 Cal. 616, 628 [44 P. 314]; *People* v. *Wong Loung* (1911) 159 Cal. 520, 528-529 [114 P. 829].) Here, defendant was aware of the court's apparent contact with family members before they testified, and could have objected and sought an explanation. He failed to do so. We need not, under the circumstances, presume prejudice.

Moreover, nothing in the record suggests that the contact went beyond the court's stated interest in ascertaining whether members of defendant's

---

[6]Defendant refers in a footnote to a declaration of the investigator, Mr. Welby, which he plans to file with a petition for writ of habeas corpus. The declaration will state, according to defendant, that Welby met personally with the trial judge to discuss his appointment, which meetings were not transcribed. Even assuming, arguendo, that such meetings took place and rise to the level of "proceedings," nothing from the quoted portions of the declaration appears to suggest that defendant was harmed by the unreported meetings. On the contrary, the appointment was plainly designed to benefit defendant.

family would be willing to testify in mitigation. As the court stated in explaining its decision to appoint additional counsel, "I am not going to play an active part in the rest of this trial . . . ." Although we do not condone the court's apparent contact with potential witnesses, under the circumstances we cannot perceive how the court's actions could have prejudicially affected the verdict.

 Finally, defendant refers to a comment by Attorney Landau at the outset of the penalty retrial, indicating that he had provided the court with several books containing "information with respect to individuals incarcerated and their contributions for a lengthy period of time"; such contributions included "works of poetry, and works of art done by prisoners while incarcerated for substantial periods." Mr. Landau explained that he wanted to ensure "that the Court has had an opportunity as well as the People to review these pieces of literature." These books were apparently proferred in conjunction with Attorney Landau's submission of a drawing by defendant as evidence in mitigation, and his argument that defendant's artistic talent militated in favor of life imprisonment.

Defendant's argument appears to be that section 190.9 was violated because the books themselves were not offered into evidence. Defendant does not explain how the statutory requirement that all "proceedings" be reported relates to the admission of evidence. Moreover, there is no requirement that counsel submit into evidence every document to which he or she refers and there is nothing to suggest that the court here considered the books in its sentencing determination. Accordingly, we find no error.

### E. *Defendant's Right to Be Present*

 Defendant claims he was improperly denied his constitutional right to be present on three occasions during the penalty retrial. He contends he was prejudiced by his absence (1) when the trial court stayed its original sentence of death to permit the introduction of mitigating evidence; (2) when the trial court appointed Investigator Welby and Attorney Landau to adduce and present all available mitigating evidence at the subsequent continuation of the penalty phase; and (3) from an interim hearing in which the trial court clarified the roles of defense counsel and Attorney Landau, and specified the procedures to be followed at the continued penalty phase hearing. None of the claims is meritorious.

"[T]he accused is not entitled to be personally present either in chambers or at bench discussions which occur outside of the jury's presence on questions of law or other matters in which defendant's presence does not bear a 'reasonably substantial relation to the fullness of his opportunity to defend

against the charge.' " (*People* v. *Jackson* (1980) 28 Cal.3d 264, 309-310 [168 Cal.Rptr. 603, 618 P.2d 149]; accord *People* v. *Bittaker* (1989) 48 Cal.3d 1046, 1080 [259 Cal.Rptr. 630, 774 P.2d 659]; *People* v. *Rich* (1988) 45 Cal.3d 1036, 1105 [248 Cal.Rptr. 510, 755 P.2d 960].)

We find no arguable basis for claiming that defendant's absence in the three instances cited "prejudiced his case or denied him a fair and impartial trial." (*People* v. *Jackson*, *supra*, 28 Cal.3d at pp. 309-310; *People* v. *Bloyd* (1987) 43 Cal.3d 333, 360 [233 Cal.Rptr. 368, 729 P.2d 802].) As noted earlier, the trial court, acting under compulsion of *Deere I*, *supra*, 41 Cal.3d 353, stayed the previously imposed sentence of death and appointed an investigator and special counsel to present a case in mitigation. Shortly thereafter, but prior to the continued penalty phase hearing, the court met briefly with counsel to make certain, in the court's words, "that we get evidence in here as requested by Justice Mosk having to do with the evidence needed on the mitigating circumstances . . . ." Defendant makes no showing that his absence on any of the foregoing occasions prejudiced his case or denied him a fair trial. We conclude, accordingly, that the court did not err in proceeding in his absence.

F. *Victim Impact Evidence*

█ Defendant contends that, contrary to *Booth* v. *Maryland* (1987) 482 U.S. 496 [96 L.Ed.2d 440, 107 S.Ct. 2529] and *South Carolina* v. *Gathers* (1989) 490 U.S. 805 [104 L.Ed.2d 876, 109 S.Ct. 2207], the "decisive" factor in the court's determination that death was the appropriate sentence was "the effect of the crime" on the surviving wife and mother of the three victims.

There was no evidence submitted relating to the character of the victims or the impact of the crime on the victims' family. Defendant bases his claim on several comments by the trial court during his weighing of the aggravating and mitigating circumstances. The court stated: "And you also knew that the killing of your girlfriend's nieces would bring great sadness." The court then referred to the fact that the two murdered children had loved defendant, and that defendant was "crazy about the kids." The following exchange then occurred: "The Court: Can you think of anything sadder you could do to a mother or father—a mother in this case. Losing a husband and two kids? [¶] Defendant: No. [¶] The Court: Me either. I've thought about that. I've thought about it a lot. When you go out and shoot somebody with a rifle—when you're in the service, it doesn't hurt you too much because you're told that is right. But stripping away the life of children and a husband from somebody that wasn't directly connected with you, that puts that into the aggravating circumstances to the extent that everything

else I say is a bunch of nonsense. If you shot the Judge, it might have been different."

Viewed in context, we are persuaded that the court's remarks were addressed primarily to the circumstances of the crime and defendant's moral culpability, a subject which remains open to fair comment under *Booth* v. *Maryland, supra,* 482 U.S. at page 507, footnote 10 [96 L.Ed.2d at page 451]. (Accord *People* v. *Stankewitz* (1990) 51 Cal.3d 72, 111 [270 Cal.Rptr. 817, 793 P.2d 23].) The court focused on the fact that defendant "knew" that killing his girlfriend's nieces would bring her great sadness. In this respect the court was referring to the evidence that the crimes were motivated by defendant's desire to retaliate against his girlfriend for leaving him. He had threatened to kill members of her family when she told him of her plans, and he ruthlessly carried out his threats. Thus, as the court here accurately stated, defendant chose to "strip[] away the life of children and a husband from somebody that wasn't directly connected with" him.

At sentencing and in the determination of life or death, the trial court as the representative of justice need be neither mute nor muffled. We conclude that the court's remarks did not implicate the Eighth Amendment considerations involved in *Booth* v. *Maryland, supra,* 482 U.S. 496, and *South Carolina* v. *Gathers, supra,* 490 U.S. 805.

## G. *Allegations of Judicial Misconduct*

Defendant next contends the trial court engaged in a variety of misconduct necessitating reversal of the judgment. None of the claims has merit.

First, defendant asserts that the trial court, in rendering the sentence of death, improperly considered the special circumstance set forth in section 190.2, subdivision (a)(5) (murder to prevent arrest) and the sentencing factor contained in section 190.3, factor (b) (prior use of force or violence). The court's references to these sections were made at the start of the penalty retrial in the course of responding to defendant's motion for a finding that the record was "insufficient as a matter of law to justify a finding of aggravation." The court properly observed that it was not "in a position" to consider such a motion before the presentation of the evidence. It then noted that the evidence might potentially show a murder to prevent arrest, or the presence of prior criminal activity involving the use of violence or force. The court did not indicate, however, that either of these provisions was applicable to the facts of the case.

Indeed, the court subsequently rejected as unsupported by the evidence any implication that the children were killed "because of the possibility that

they might talk to people and turn [defendant] into the police department." The court also specifically found no evidence of any prior criminal activity by defendant involving the use of force or violence. Hence, there was no error.

 Defendant next contends the trial court prejudicially interfered with potential witnesses in mitigation. He refers to a statement by Mr. Welby (the court appointed investigator) when called as a witness at the penalty retrial. Welby testified that he had interviewed 30 to 35 people. On cross-examination, the prosecutor asked Welby to identify the people he had interviewed. Welby responded: "The four people that were here today, and another, Conrad Hill, who is a local barber in town, I think he was excused by Judge Metheny. For whatever reason, I don't know. They were the only ones that were actually willing to talk at all about [defendant]."

The record contains no other reference to the individual whom the trial court purportedly "excused." It does not show whether he was in fact excused, the reasons for such action if it occurred, or even whether he had any mitigating evidence to offer. Neither defense counsel nor Mr. Landau made any objection or effort to pursue the matter. On the record, therefore, any claim of error is sheer speculation, and does not support a finding of prejudice.

Defendant also claims the trial court improperly based the multiple-murder special-circumstance finding (§ 190.2, subd. (a)(3)) on the murders of the two children. At an early point in the penalty retrial, the court observed that the killings of the "little girls were not premeditated. That there was not malice aforethought." Relying on this statement, defendant asserts that the finding of second degree murder as to the two children was invalid, and therefore the special circumstance finding must fall.

The contention lacks merit. First, the trial court had specifically found that the killings of the two children constituted second degree murder during the guilt phase. This court affirmed that finding in defendant's first appeal. (*Deere I, supra,* 41 Cal.3d at p. 368.) The issue was not before the trial court at the penalty phase retrial, and therefore is not cognizable on this appeal.

Moreover, the court's comment was of no consequence; the context in which it was stated, the initial sentencing, was later mooted by the presentation of mitigating evidence and the resentencing. Furthermore, it is readily apparent, from the context of the remark itself, that the court simply misspoke itself. The court's express intention was to reaffirm that the murders were in the second degree because of the absence of *premeditation* and

*deliberation*, not the absence of malice aforethought. As the court later explained when it redetermined the penalty after the presentation of mitigating evidence: "I found their murder to be in the second degree because there was no evidence of any anticipating that [defendant] would find those children there when they walked in with daddy. There isn't any evidence to that effect. So that's where I stop on that particular point." Hence, there is no basis for a finding of error or misconduct in this regard.

Defendant next contends that the court improperly relied on section 190.2, subdivision (a)(10) (witness killing) in its sentencing decision. The record shows, however, that the court made no reference to this special circumstance in its statement of decision. Indeed, as noted earlier, the trial court specifically found that the evidence did not support a finding that the children were killed to prevent them from reporting defendant to the police.

■ Finally, defendant asserts that the trial court's initial decision to impose a sentence of death rendered the subsequent resentencing (following the introduction of mitigating evidence) a "mockery." Nothing in the record, in logic or in law supports defendant's claim that the court was disqualified from hearing the matter. Its initial sentencing decision followed and was based, in part, on defense counsel's refusal to introduce any evidence in mitigation. It does not follow that the court was disabled, as a result, from rendering an objective verdict after it heard a full presentation of the mitigating evidence. On the contrary, the record indicates that the trial court remained scrupulously fair and objective throughout the proceedings. It carefully weighed and considered both the aggravating and mitigating evidence after they were presented. Indeed, neither defense counsel nor Mr. Landau challenged the impartiality of the trial court at any point during the proceedings. We find, accordingly, no merit to the claim of error.

## H. *Reasonable Doubt*

■ Lastly, defendant contends the trial court erred in failing to apply a reasonable doubt standard in determining that death was the appropriate penalty. We have repeatedly rejected similar contentions. (*People v. Frank* (1990) 51 Cal.3d 718, 740 [274 Cal.Rptr. 372, 798 P.2d 1215]; *People v. Bonillas* (1989) 48 Cal.3d 757, 790 [257 Cal.Rptr. 895, 771 P.2d 844]; *People v. Jennings* (1988) 46 Cal.3d 963, 992 [251 Cal.Rptr. 278, 760 P.2d 475]; *People v. Williams* (1988) 44 Cal.3d 883, 960-961 [245 Cal.Rptr. 336, 751 P.2d 395].) Defendant fails to adduce any persuasive reasons to compel a reconsideration of these prior holdings.

## III.

### CONCLUSION

The judgment is affirmed in its entirety.

Lucas, C. J., Panelli, J., Kennard, J., and Baxter, J., concurred.

**MOSK, J.,** Concurring.—I concur in the judgment. After review, I have found no error warranting reversal.

I write separately to reaffirm the teaching of *People v. Deere* (1985) 41 Cal.3d 353 [222 Cal.Rptr. 13, 710 P.2d 925] (hereafter sometimes *Deere I*), and to reject the criticism of that decision in *People v. Bloom* (1989) 48 Cal.3d 1194 [259 Cal.Rptr. 669, 774 P.2d 698].

In *Deere I,* we reversed the judgment of death originally entered against defendant on the ground that counsel's failure to present evidence in mitigation—although in accord with defendant's request—rendered the penalty determination constitutionally unreliable.

Specifically, *Deere I* held that counsel's failure to present evidence in mitigation introduced error into the penalty proceeding.

"To permit a defendant convicted of a potentially capital crime to bar his counsel from introducing mitigating evidence at the penalty phase . . . would . . . prevent this court from discharging its constitutional and statutory duty to review a judgment of death upon the complete record of the case, because a significant portion of the evidence of the appropriateness of the penalty would be missing.

"This deficiency of the record implicates [a] paramount concern of the state: 'in capital cases . . . the state has a strong interest in reducing the risk of mistaken judgments.' . . . [T]he United States Supreme Court has repeatedly recognized that the qualitative difference between death and all other penalties demands a correspondingly higher degree of reliability in the determination that death is the appropriate punishment. . . . [T]he high court has insisted that the sentencer must be permitted to consider any aspect of the defendant's character and record as an independently mitigating factor.

"To allow a capital defendant to prevent the introduction of mitigating evidence on his behalf withholds from the trier of fact potentially crucial information bearing on the penalty decision no less than if the defendant

was himself prevented from introducing such evidence by statute or judicial ruling. In either case the state's interest in a reliable penalty determination is defeated." (*People* v. *Deere, supra,* 41 Cal.3d at pp. 363-364, citations omitted.)

*Deere I* also held that so long as "the record . . . demonstrates 'the possibility that at least *someone* might have been called to testify on [the] defendant's behalf and to urge that his life be spared[]' " (41 Cal.3d at p. 367, italics in original), the error cannot be deemed harmless. "When the sentencer in a capital case is deprived of all or a substantial part of the available evidence in mitigation, 'the potential for prejudice is too obvious to require proof.' Indeed, 'short of substituting a verdict of its own, there is no way for a reviewing court to determine what effect unpresented mitigating evidence might have had on the sentencer's decision.' We have no doubt that a judgment of death imposed in such circumstances constitutes a miscarriage of justice: not only [would the] defendant not have [had] a fair penalty trial—in effect he [would have] had no penalty trial at all." (*People* v. *Deere, supra,* 41 Cal.3d at p. 368, citations omitted.)

But in *People* v. *Bloom, supra,* 48 Cal.3d 1194, a majority of this court disapproved the analysis of *Deere I.* They stated that the "reliability [required by the Eighth Amendment in death penalty cases] is attained when the prosecution has discharged its burden of proof at the guilt and penalty phases pursuant to the rules of evidence and within the guidelines of a constitutional death penalty statute, the death verdict has been returned under proper instructions and procedures, and the trier of penalty has duly considered the relevant mitigating evidence, if any, which the defendant has chosen to present." (*People* v. *Bloom, supra,* 48 Cal.3d at p. 1228.)

To my mind, the *Bloom* assertion is altogether unsound. If in any matter we cannot allow form to prevail over substance, it is in a situation like the present in which a person's life is at stake.

"Manifestly, the penalty phase of a capital trial in this state is an adversary process. 'The very premise of our adversary system of criminal justice is that partisan advocacy on both sides of a case will best promote the ultimate objective' of punishment in accordance with deserts. In other words, 'The system assumes that adversarial testing will ultimately advance the public interest in truth and fairness.' It follows that the system requires 'meaningful adversarial testing.' When such testing is absent, the process breaks down and hence its result must be deemed unreliable as a matter of law.

"Further, as the United States Supreme Court has repeatedly emphasized, 'the penalty of death is qualitatively different from a sentence of

imprisonment, however long. Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.'" (*People* v. *Bloom, supra*, 48 Cal.3d at pp. 1236-1237, citations omitted (conc. & dis. opn. of Mosk, J.).)

Thus, contrary to the *Bloom* assertion, the reliability required by the Eighth Amendment in death penalty cases can be assured *only* when the record on which the verdict is based is "complete," i.e., when it does not lack any "significant portion of the evidence of the appropriateness of the penalty" that counsel reasonably concludes "'. . . makes the most compelling case in mitigation.'" (*People* v. *Deere, supra*, 41 Cal.3d at pp. 363, 364, fn. 3.)

I turn now to the case at bar. In my view, no *Deere* error occurred or, if it did, it was effectively cured. To be sure, at defendant's request counsel again declined to present available evidence in mitigation. By so doing, he violated his obligation to the court and the adversarial process. But this time, the court—wisely not anticipating *Bloom*—appointed special counsel. That counsel proceeded to introduce mitigating evidence. Indeed, he put on a case for life that, though ultimately unsuccessful, was not insubstantial.

Accordingly, having found no *Deere* error or any other defect warranting reversal, I concur in the judgment.

Broussard, J., concurred.

Appellant's petition for a rehearing was denied July 24, 1991.