Opinion by Judge SILVERMAN; Dissent by Judge W. FLETCHER.
OPINION
SILVERMAN, Circuit Judge:
Ronald Deere threatened to kill everyone in Cindy Gleason’s family if she were ever to break up with him. On March 4, 1982, Deere made good on his threat. Upset that Cindy had left him, Deere shot *1126 and killed Cindy’s brother-in-law, Don Davis, and Davis’s two young daughters, ages 7 and 2.
Deere was arrested a few days later. After having been appointed a lawyer, he expressed his desire to withdraw his plea of not guilty and to plead guilty, even though he knew he could face the death penalty. Before the plea was entered, Deere’s lawyer arranged for him to be examined by two mental health professionals — a physician with experience in psychiatry, and a psychologist. Both examiners came to remarkably similar conclusions. Both reported that Deere was oriented as to time, place and person. Neither examiner found Deere to suffer from a thought disorder.
Deere told the psychologist, William Jones, Ph.D., that he would prefer a death sentence to life imprisonment. He also said that the death penalty would make him feel better and help the people he hurt. He said that pleading guilty would protect others who would be spared the ordeal of a trial and that by pleading guilty he would protect his family from further publicity.
The physician, Tommy Bolger, M.D., a former staff psychiatrist in the California prison system and elsewhere, opined that Deere did not suffer from mental illness. However, like Dr. Jones, Dr. Bolger diagnosed Deere with severe personality and substance abuse disorders. Bolger concluded that Deere understood the charges against him and was capable of cooperating with counsel if he wanted to.
Deere’s lawyer spent countless hours with his client leading up to the change of plea. The lawyer attested that Deere was fully aware of the ramifications of his decision and was legally competent to plead guilty. Following a change-of-plea colloquy in which Deere indisputably was lucid, engaged, and evidenced knowledge of his situation, the trial judge accepted Deere’s guilty plea.
In Deere’s present habeas case, he argues that his lawyer was ineffective in 1982 for failing to request a full-blown competency hearing. We hold today that even assuming for the sake of argument that his lawyer should have requested a plenary competency hearing — despite the reports of the two mental health examiners, despite counsel’s own observations of Deere based on his extensive interaction with him, despite the observations of the prosecutor and the judge, despite Deere’s rational reasons for wanting to plead guilty — Deere nevertheless suffered no prejudice from the lack of a competency hearing because there was no reasonable probability that he would have been found incompetent to plead guilty. As we said in Dennis v. Budge, 378 F.3d 880, 890 (9th Cir.2004), “The question ... is not whether mental illness substantially affects a decision, but whether a mental disease, disorder or defect substantially affects the prisoner’s capacity to appreciate his options and make a rational choice.” Id. (Emphasis in the original) There is literally no contemporaneous evidence that Deere lacked the capacity to understand his options and to make a rational decision to accept responsibility for what he did. All of the evidence supports the trial court’s findings that Deere’s guilty plea was knowing, intelligent and competent. Those findings are presumed correct and have not been rebutted by clear and convincing evidence. See Evans v. Raines, 800 F.2d 884, 887 (9th Cir.1986).
In 1986, after Deere’s case had been remanded by the California Supreme Court for the presentation of mitigating evidence and re-sentencing, Deere once again appeared before Superior Court Judge Fred Metheny. At that time, neither Deere’s own lawyer, nor the lawyer *1127 specially appointed as a Mend-of-the-court to present mitigation on Deere’s behalf, nor the prosecutor, nor any reviewing court expressed any concern whatsoever about Judge Metheny’s mental competence. Five years later, in reviewing the transcript of Judge Metheny’s statements at the 1986 resentencing, the California Supreme Court said this about Judge Metheny: “[T]he record indicates that the trial court remained scrupulously fair and objective throughout the proceedings. It carefully weighed and considered both the aggravating and mitigating evidence after they were presented.” People v. Deere, 53 Cal.3d 705, 280 Cal.Rptr. 424, 808 P.2d 1181, 1195 (1991) (in bank). The California Supreme Court affirmed every one of Judge Metheny’s rulings. Despite this, Deere now seeks discovery and an eviden-tiary hearing on his claim that his lawyer was ineffective in 1986 for failing to move to disqualify Judge Metheny due to the judge’s supposed senility.
We hold today that the district court did not abuse its discretion in denying Deere’s request for discovery and a hearing on the issue. First, Deere came forward with no admissible evidence that the judge was mentally impaired in 1986. The most Deere offered were anecdotes recounted by a grand total of three lawyers, anecdotes that are either hearsay, or that do not shed light on Judge Metheny’s mental status in 1986, or that reveal no more than eccentricity as distinguished from dementia. Tellingly, although Deere’s habeas counsel had access to a stable of mental health professionals, counsel furnished nothing — zero—from any mental health professional opining that any of the stories about Judge Metheny might be indicative of mental impairment or even that they warrant further investigation. Second, there is absolutely nothing to show that any of the supposed incidents involving other lawyers were ever communicated to Deere’s lawyer. Deere’s lawyer can hardly be faulted for failing to act upon gossip that was never passed along to him. Third, the California Supreme Court reviewed Judge Metheny’s handling of the 1986 proceeding, affirmed him in toto, and found that he was scrupulously fair and objective throughout the proceeding, and that he carefully weighed and considered the evidence. This appellate ruling demonstrates two things: First, that Judge Metheny was not impaired in 1986; and second, if the state supreme court had no cause to question Judge Metheny’s mental status, neither did Deere’s counsel.
I. Background
Cindy Gleason was Deere’s former girlfriend and the mother of his baby daughter. Don Davis was married to Cindy’s sister Kathy. Kathy and Don had two daughters, Michelle and Melissa.
Cindy broke up with Deere around February 26, 1982. Some time on or after March 1, Deere took a .22 caliber single-action Ithaca rifle from the home of an acquaintance, Marc Nelson.
On March 2,1982, Deere told Kathy that he was mad at Don for implying that Kathy was involved with Deere. Deere also told Kathy that he was going to do something that would cause her to hate him. But Deere wouldn’t be around for her to hate. Bruce Norton, a friend of Kathy’s, was present during the conversation. After Kathy left, Deere told Norton, “I’m gonna leave town, but I’ve got something to do first.” Deere added that he only thought he’d get a couple of years in prison if he killed a couple of people. Norton testified that Deere did not appear to be intoxicated at the time.
Two days later, on March 4, 1982, Deere was seen around town either drunk or in a daze. Deere telephoned Cindy around 3:20 p.m. and said, “I’m not going to be responsible for what I do today.” Deere *1128 then walked to the Davis trailer, broke in and waited for Davis to return. Davis called Cindy around 4:00 p.m. to say that someone had been in his trailer. Cindy asked Davis to call her back and let her know if anything was missing. Davis never called back. Later that evening Cindy and Kathy found the bodies of Davis and the two children in the Davis trailer. They had been shot with a .22 caliber rifle.
On March 9, 1982, five days after the murders, police found Deere camping in the desert near Blythe, and arrested him. Deere told the officers, “I was going to call out to you but I was afraid I would be shot.” At Deere’s campsite, police found Nelson’s .22 caliber rifle (later confirmed as the murder weapon), .22 caliber bullets, a glass and some pictures of Cindy taken from the Davis trailer and letters written by Deere to his family. Davis’s pickup truck was found in a ditch adjacent to where Deere was found.
Riverside Police officers immediately requested that Tommy Bolger, M.D., the consulting psychiatrist for Riverside County, interview Deere at the jail. Dr. Bolger had obtained a Doctor of Osteopathy degree in 1957. However, he was allowed to use the “M.D.” designation pursuant to the California Reunification Act of 1962. Cal. Bus. & Prof.Code § 2396 (1962); Cal. Bus. & Prof.Code § 2275 (2012). Dr. Bolger had worked as a surgeon and medical doctor and trained in psychiatry at Patton State Hospital from 1965 through 1970. In 1975, he was hired as Chief Medical Officer at San Quentin. In September of the same year, he transferred to Soledad State Prison, where he served as a staff psychiatrist from 1977 through 1979. When he resigned from Soledad, Dr. Bol-ger moved to Blythe, opened a medical/psychiatric practice and consulted as a psychiatrist for Riverside and San Bernar-dino Counties. Dr. Bolger died in 1987.[1]
On March 9, 1982, the day Deere was arrested, Dr. Bolger interviewed Deere at the police station for a little over an hour. The next day, Dr. Bolger wrote that Deere was cooperative and competent. Deere had acknowledged that he was aware that anything he told Dr. Bolger could be used against him in court.
Dr. Bolger obtained a complete history from Deere during the interview. Deere told Dr. Bolger that he was being held for three counts of murder. He said he had threatened to kill Cindy, his common-law-wife, if she left him. Deere and Cindy had a six-month-old child. Cindy had another daughter from a previous relationship. Deere stated that he knew Don, Kathy, Michelle and Melissa “well” because Deere, Cindy, their daughter and Cindy’s other daughter had lived with the Davis family until Cindy left Deere. Kathy was divorcing Don. Deere claimed that he loved Melissa and Michelle. The girls were “real sweeties” who had played with his children. Deere stated, “I don’t know why I did this. I hope that if I am convicted that I will get the gas chamber.”
Deere also told Dr. Bolger he had been in special education classes, did poorly in *1129 school and had a history of self-mutilation and alcohol and drug abuse. Deere stated that he cut himself or broke things when he got “enraged.”
Dr. Bolger opined that Deere “answers appropriately.” He is “oriented as to place, time and date,” and is not delusional. Dr. Bolger wrote that Deere is not mentally ill, but has “a severe personality problem.” He “does understand the nature and the charges against him” and “was certainly capable of forming the intent and then carrying out the action.” Finally, Dr. Bolger opined that Deere “is capable of cooperating with counsel in his defense, if he feels it is to his advantage.”
Dr. Bolger diagnosed a “Dependent personality type, with explosive features, Alcohol and drugs as factor” and an “Antisocial personality type, with borderline features, not psychotic.”
On the same day Dr. Bolger provided his report to police, Glenn S. Jones was appointed to defend Deere. Mr. Jones, a Riverside County Public Defender, had been admitted to the bar in 1972. Before representing Deere, Mr. Jones had practiced for 10 years as a criminal defense trial attorney, with eight years as an assistant public defender. Mr. Jones had represented defendants in “a couple of dozen” murder cases, with one prior death penalty case.
Deere initially pled not guilty. Mr. Jones testified in 1998 that he had repeatedly discussed the case with Deere “dozens of times” for hours at a time. From 1982 through 1986, Deere consistently told Mr. Jones that he intended to plead guilty, waive a jury trial and request the death penalty. Mr. Jones said that Deere consistently gave three reasons for wanting to plead guilty, even if it meant the death penalty. First, Deere was “concerned about his family and friends, his relationships.” Deere “did not want anything done what would in any way bring sadness or pain to” his family. He “had done enough, and he wasn’t going to do anymore.” Second, he wanted to show that he had dignity and morality. Third, Deere wanted to take responsibility for his actions because he had committed the crimes and believed in capital punishment.
Mr. Jones would later testify that at the outset of the representation he would not consent to Deere pleading guilty. But “over time,” Mr. Jones concluded that, although Deere was not well-educated, he was “very intelligent” and “very articulate.” As a result of their numerous conversations, Mr. Jones had “absolutely no doubt that Deere was competent.” Mr. Jones stated:
[Deere’s] discussions with me were always vivid and intelligent, no indication that he did not know what we were doing, with the consequences of what we were doing. He knew exactly what he was charged with and what the proceedings were all about. There were just no hallmarks of incompetency there at all.
Mr. Jones also testified in 1998 that there “was never a question in [his] mind” that Deere was able to assist with his defense:
He had the ability. It was a very reasoned decision he made as to what he wanted to do, which was the reason why he acted the way he did or said what he said or did what he did. Not because he was acting under any delusion or hallucination or fantasy or any kind of psychiatric or psychological, you know, reason for his behavior.
Mr. Jones added that Deere cooperated with his defense by listening to and discussing Mr. Jones’s suggestions, signing releases, never refusing to talk to Mr. Jones, and not interrupting discussions or walking out.
Mr. Jones also stated that he “found no indication that [Deere’s] desire to plead guilty and obtain the death penalty had *1130 anything to do with a death wish or that there was any suicidal impulse behind [Deere’s] desire to plead guilty.” Rather, Deere pled guilty “out of a strong sense of justice he had that he deserved the death penalty; it was a moral statement of principle that I accepted.” “It was clear” to Mr. Jones that Deere “understood every aspect of the proceeding.” Mr. Jones added, “I have dealt with hundreds, thousands of defendants, and [Deere] did not in any way, shape, or form impress me as being incompetent.”
Deere eventually persuaded Mr. Jones that he wanted to plead guilty, was competent to plead guilty and was prepared to take responsibility for his actions.
Mr. Jones testified in 1998 that he wanted to pursue insanity and diminished capacity mental health defenses in 1982. He obtained funding for mental health experts, intended to hire at least one psychologist and psychiatrist and he hired a psychologist, William Jones, Ph.D. (no relation to Mr. Jones), to evaluate Deere for mental health defenses. Mr. Jones requested Dr. Jones to perform a general mental examination of Deere, but not to assess him for competency. His reason for this was two-fold: first, he did not doubt Deere’s competency; and second, it was his practice to use separate experts for competency questions and mental health defenses.
Mr. Jones and Deere had several discussions about possible mental health defenses. But, Deere consistently refused to “do anything inconsistent with his ultimate choice,” to accept responsibility for what he had done. Deere convinced Mr. Jones that “he would have no part in any kind of mental defense.”
On June 18, 1982, Deere moved to change his pleas to guilty. Judge Fred Metheny presided over Deere’s case. Because the Information did not specify the degrees of murder, the parties agreed that the judge would decide the degrees of murder and special circumstances if the guilty plea were accepted. Judge Methe-ny advised Deere that he could be facing the death penalty if he pled guilty. Deere assured the judge that he had discussed his case with Mr. Jones. The prosecutor then suggested that before the court entertain a change of plea, it should appoint a psychiatrist to examine Deere for competence just to make sure that the plea was “proper and just.” The prosecutor recommended Dr. Bolger, who had “previously examined” Deere. Mr. Jones agreed to Dr. Bolger’s appointment. Judge Methe-ny then appointed Dr. Bolger to examine Deere.
Dr. Bolger interviewed and tested Deere for an additional hour and a half and provided his second written report dated June 21, 1982. Dr. Bolger found Deere “extremely cooperative and alert.” Deere’s mood was “stable ... neither being depressed nor unduly elated.” Deere denied delusions and hallucinations. Dr. Bolger found “no evidence of organieity.” Dr. Bolger also opined that Deere showed no evidence of psychosis or abnormal thinking and was not mentally ill.
Dr. Bolger further opined that Deere was “able to carry his ideas to goal.” He was “well aware of the charges” and “implications of pleading guilty.” Deere had been “well advised” and was “aware of and able to understand the meaning of the waiver of the rights to a jury trial.” He was “able to adequately assist his attorney in the preparation and the presentation of his case.” Finally, Deere was aware of a probability of a death sentence. But, he also knew that a court would decide the sentence. Deere was motivated to having “as short a trial as possible ... since he indicate[d] that either pleading guilty or not guilty would in all probability result in the same decision.”
*1131 At the same time Dr. Bolger was examining Deere, Mr. Jones was pursuing a separate mental health defense examination by Dr. Jones because, even if a guilty plea were accepted, there would still be a trial to determine the degree of murder. Mr. Jones testified in 1998 that, after hours of discussion with Deere, Deere agreed to meet with Dr. Jones. On June 23, 1982, Dr. Jones examined and tested Deere for one and a half hours.
Two days later, on June 25, 1982, Deere advised the court that he intended to plead guilty to the three counts of murder. Judge Metheny found that Deere’s appearance, actions, comments and conduct in court had established that Deere understood the charges and was “ready, willing and able to cooperate” with defense counsel. Dr. Bolger’s report, Judge Metheny stated, had confirmed the judge’s observations that Deere was competent. Mr. Jones agreed that Deere was competent, stating:
I have seen no evidence in Mr. Deere that would suggest that he’s in any way incompetent. I’ve reviewed with him the report of Dr. Bolger, and I’d be willing to stipulate at this time the Court may accept the report and base its rulings on the report.
The prosecutor “concur[ed] with Mr. Jones’ evaluation of Mr. Deere’s mental state” and also stipulated that the court could consider Dr. Bolger’s report that Deere was aware of the charges, understood his waiver and was competent.
The change of plea transcript establishes that Deere was lucid, clearly understood the proceedings and consulted with counsel when he wanted to. Judge Methe-ny extensively questioned Deere about the rights Deere was waiving, and Deere responded appropriately. When asked to explain his understanding of the right to a jury trial, Deere said, “twelve people, you know, find out if you’re guilty or not, on the evidence they have.” When asked what the charges were, Deere responded, “[tjhree counts of murder.” Judge Methe-ny then asked Deere, “what is your understanding of the nature of that charge?” Deere conferred with Mr. Jones and responded, “[i]ntentional killings with malice.” In response to Judge Metheny’s question of what Deere had done to be charged with murder, Deere stated:
On March 4th, 1982, at about 4:00 p.m. I shot, with intent to kill and did kill Don Davis, Melissa, — I mean Michelle Davis, Melissa Davis. I used a .22 caliber rifle, and the shootings took place at the Davis’ home near Blythe, Riverside County, California. At the time of the shootings, none of the three victims did anything to provoke me in any way.
When asked what sentence he was facing, Deere responded, “death or life in prison.” In response to the question regarding what sentence he faced for using the rifle, Deere conferred with counsel and responded, “anything less than life, you know, would add two years to any other sentence.” Finally, Judge Metheny asked Deere, “who do you believe will decide what your sentence will be?” Deere responded, “[t]he judge or the jury.”
When the judge asked Mr. Jones about the possibility of an insanity defense or mental states defense, Mr. Jones responded:
Your honor, I have spent a great deal of effort and time investigating the possibility of insanity defense or some other mentally related defense. It is my firm conclusion that there is no such defense; and even if there were, Mr. Deere has advised me that he, under no circumstances, will enter a plea of guilty by reason of insanity.
I find no evidence to support any defense that would reduce these charges to manslaughter.
*1132 Mr. Jones then concurred in the plea and reaffirmed his belief that Deere was competent to enter the plea:
As to this particular case, Mr. Deere and I have spent literally hours discussing the case, debating the case, literally arguing about what is appropriate. I think it’s rather obvious that a man’s pleading guilty in a capital case is rare. And when I began this case, I didn’t even consider — it didn’t even enter my mind that I would consent to such a plea. And Mr. Deere has slowly but surely persuaded me that this is what he wishes to do, that he’s competent to do it, and he’s prepared to take the full responsibility for his actions. And I can find absolutely no basis, in my experience, training or the investigation of this case, which would suggest he should not be permitted to do exactly what he wants to do, knowing the consequences of his act.
Mr. Jones advised the court that Deere had given Mr. Jones three reasons for pleading guilty. First, Deere wanted to take responsibility for his actions and “maintain[ ] a small amount of dignity as a human being.” Mr. Jones explained, “[h]e knows that doesn’t change what happened. He knows it doesn’t change the agony and the hurt that he’s caused the survivors, but it’s the one thing he can do to show that he can take responsibility.” Second, Deere wanted to protect his family and the victims’ family from a “highly publicized” trial and “more agony.” Third, Deere knew he would be found guilty, favored capital punishment and was willing to face justice. Mr. Jones explained:
Mr. Deere and I have debated the theory of capital punishment quite a bit. He is in favor of capital punishment, and I am not. He thinks that this case is an appropriate case for capital punishment, and he simply feels that justice should be done in this case, and he feels that pleading guilty and taking what results has justice; whatever happens, happens ... He knows the result of a jury trial. He knows what would happen if the case went to jury trial, and he feels that the expense of a circus or charade of a trial is not right for him or for the community-
Deere then pled guilty to three open counts of murder[2] and admitted to using the gun. Judge Metheny found that the guilty pleas were knowing, voluntary and supported by a factual basis.
Five days after the change of plea hearing, Deere again met with Dr. Jones for the continuation of the examination Mr. Jones requested in aid of proceedings yet to come to determine the degree of murder and the penalty. Dr. Jones met with and tested Deere for about the same length of time that Dr. Bolger had met with and tested Deere. Dr. Jones’s 1982 findings, conclusions and diagnoses were amazingly similar to Dr. Bolger’s. Dr. Jones opined in 1982 that “Deere was oriented as to time, place, and person” and “aware of the charges against him.” He was “generally cooperative.” Deere had “no obvious thought disorders in his communication.” His memory was “generally adequate.” He denied hallucinations and delusions. Deere’s tests were “within normal limits” and did not indicate visual motor or neurological dysfunction. Dr. Jones also opined that Deere cut himself to discharge anger, get attention and sympathy and to manipulate others. Dr. Jones concluded that the self-mutilation was “a very powerful attention-getting device.”
Deere told Dr. Jones that he cooperated because defense counsel “told him that lack of cooperation in a psychological evaluation might jeopardize his conviction.” Deere “wished to be found guilty and to *1133 accept whatever punishment the court would impose.” Deere also told Dr. Jones that he was “willing to accept” the death penalty and “indeed would prefer it to life imprisonment.” Deere stated that a death sentence would make him feel better, “help the people he has hurt,” protect others from participating in trial, protect his family and keep the matter out of the newspapers. Pleading guilty, Dr. Jones opined, was “a further extension of [Deere’s] very strong masochistic tendencies.”
Dr. Jones diagnosed Deere with adjustment disorder with depressed mood; mixed substance abuse disorder, including abuse of alcohol, marijuana, stimulants, amphetamines; and borderline personality disorder with anti-social aspects. In other words, Dr. Jones and Dr. Bolger basically came to the same conclusions. Mr. Jones would later testify that none of the reports, including the reports from Dr. Bol-ger, Dr. Jones and the two private investigators that Mr. Jones hired, gave Mr. Jones any information that would have caused him to question Deere’s competence.
On July 23, 1982, the parties returned to court for Judge Metheny to determine the degrees of the three murders. Mr. Jones testified in 1998 that he and Deere had vigorously discussed the issue. Mr. Jones wanted to go for a second degree murder finding. Like all their conversations, it was “give and take:”
He always knew what he wanted, and he was going to get what he wanted to get. And we dealt with each other very civilly on all the vigorous points, so it wasn’t simply him being absolutely uncooperative with me at some point or not. There were always discussions, and eventually when we would do something his way, it was because: “Okay, Ronnie, we’ve discussed this, and its obviously what you want to do, and I can’t see a reason at this point in doing something different.”
Mr. Jones testified that, even though Deere didn’t like his position regarding second degree murder, Deere agreed to let Mr. Jones argue that the crimes were second, not first, degree murder.
The parties stipulated that Judge Meth-eny could consider the preliminary hearing testimony to determine the degrees of murder. Again, Deere was alert and engaged. At the prosecutor’s request, Judge Metheny again advised Deere that a first degree murder finding would require a penalty phase and could result in a death sentence. Deere responded appropriately to the judge’s questions and waived his rights.
When Judge Metheny expressed concern that the preliminary hearing testimony might not establish Deere’s state of mind at the time of the crimes, Mr. Jones responded that Deere had given specific instructions not to offer evidence regarding the degrees of murder and asked to continue the discussion in chambers. In chambers, Judge Metheny unsuccessfully tried to convince Deere to allow mental health expert testimony. Judge Metheny explained to Deere that state of mind evidence would help establish first or second degree murder. He suggested that Deere allow Dr. Bolger to testify. Deere responded that he didn’t “agree upon all the doctors.” The judge advised Deere that he would not have to testify, but asked Deere to agree to let the doctors testify.
However, at the next hearing, Mr. Jones advised the court that he would not be offering Dr. Bolger’s testimony because Deere objected to having private family matters discussed in court. Deere confirmed that he agreed with defense counsel.[3] The prosecutor declined to present *1134 additional evidence and reaffirmed that he believed that Deere was competent, making rational decisions and acting appropriately. Judge Metheny agreed with the prosecutor’s assessment, and again found that Deere was competent and rational.
The prosecutor argued for first degree murder because the evidence showed that Deere planned the murder for days and then carried out his plan. Deere shot the girls, he argued, because they were witnesses. Mr. Jones argued for second degree murder, citing evidence that Deere was suffering emotional turmoil and intoxicated. In addition, Mr. Jones argued that the children did not live at the trailer, and there was no way Deere could know the girls would be with their father that afternoon. Thus, premeditation as to them was lacking.
Judge Metheny then found that the killing of the two children was second degree murder, but that the killing of Don Davis was first degree murder. In a nuanced ruling, the judge reasoned that Deere clearly planned and intended to kill the father, but had not anticipated that the children would be present. Because the evidence regarding the children could be reasonably interpreted as either first or second degree murder, Judge Metheny found Deere guilty of the second degree murder of the children.
Judge Metheny also found that the multiple murder allegation was true: Deere committed multiple first and second degree murders. This finding made Deere eligible for the death penalty.
At the penalty phase hearing, Deere attempted to waive his right to a jury trial. But the prosecutor refused to waive the state’s right. Deere indicated his intention to absent himself. Mr. Jones explained to the court:
You know, he wants a death verdict. He said that over and over again. And any procedure that may impede that he just doesn’t want to have any part of, and he sees a jury trial on the penalty phase as possibly resulting in a verdict other than a death penalty. So that’s his line of thinking. It’s very rational, and I don’t see any possible basis for concluding that he’s not competent. His lack of cooperation doesn’t stem from any mental disability. It stems from his very logical decision about what he wants as a result.
Ultimately, the parties agreed to waive a penalty jury. The judge again found Deere competent:
I think you’re competent to make that decision. I’ve listened to that decision for a number of times now, and I haven’t the slightest doubt that you have the ability and the right to make that decision.
At the continued penalty hearing, Deere reaffirmed that he wanted to waive his right to a jury trial at the penalty phase and understood the rights he was waiving. After Mr. Jones and the prosecutor concurred in the waiver, Judge Metheny found Deere’s waiver to be knowing and voluntary.
At Deere’s request, Mr. Jones did not present mitigation evidence. Instead, the parties stipulated that Judge Metheny could consider the evidence already admit *1135 ted at the degree of murder hearing. Judge Metheny made sure that Deere concurred and understood that he was waiving his right to confront witnesses and found Deere’s waiver to be knowing and voluntary.
Deere expressed remorse for the crimes and said that he deserved to die. Mr. Jones then commented that Deere’s actions were “unprecedented.” But, Deere had communicated his feelings “steadfastly since practically the first day.” Deere had “slowly but surely swayed” Mr. Jones to permit him to plead guilty, admit the special circumstances, waive jury trials for the guilt and penalty phases and decline to present mitigating evidence. Mr. Jones and Deere had “argued quite vociferously about what to do in this case.” But Deere stated that he didn’t want to cheapen his relationships. He did not deserve mercy and would lose his “last vestige of dignity” if he begged for mercy. The only thing Deere could do to show the victims’ family that he was sorry was to accept full responsibility for his actions.
Mr. Jones advised the court that each decision was made “in close consultation with” Deere, who knew “the consequences of every decision he’s made, as well as the consequences of his criminal acts.” Mr. Jones added that Deere’s “decisions are not suicidal, crazy decisions. They are rational, intelligent decisions by a man who realizes what he has done and says, ‘This is the only position I can take to show you that I am still a man and not an animal.’ ”
Judge Metheny then sentenced Deere to 15 years to life for the murder of each of the children and to death for the first degree murder of their father.
On December 31, 1985, the California Supreme Court affirmed the convictions and special circumstance finding, but reversed the death sentence. People v. Deere, 41 Cal.3d 353, 222 Cal.Rptr. 13, 710 P.2d 925, 926 (1985).
Different counsel appointed for Deere by the state supreme court for the automatic direct appeal argued that the trial court should have conducted a sua sponte competency hearing because preliminary hearing testimony showed that “shortly before the murders” Deere asked Kathy Davis to kill him, had exhibited suicidal tendencies and had cut himself with a razor blade in the past and “was frequently intoxicated.” Deere claimed that his guilty plea and waiver of a jury trial amounted to a suicide attempt. Id., 222 Cal.Rptr. 13, 710 P.2d at 927. The California Supreme Court rejected the claim, holding that the record did not show “substantial evidence” of mental incompetence. Id., 222 Cal.Rptr. 13, 710 P.2d at 928. Rather, the trial court and defense counsel believed Deere to be competent. The trial court had appointed the mental health expert, Dr. Bolger, “ ‘to be certain’ of defendant’s ability to stand trial and cooperate with counsel,” even though there was no evidence of incompetence before the court. Id., 222 Cal.Rptr. 13, 710 P.2d at 927-28. The mental health expert found Deere mentally competent to plead guilty. The expert opined that Deere “displayed no evidence of psychosis, abnormal thinking or mental illness” and was aware of the charges and the consequences of waiving a jury trial. Id., 222 Cal.Rptr. 13, 710 P.2d at 927.
The California Supreme Court also held that neither the decision to plead guilty nor the waiver of a jury trial established incompetence, reasoning that Deere gave rational reasons for pleading guilty and avoiding a jury trial. Id., 222 Cal.Rptr. 13, 710 P.2d at 927-28. He “felt great remorse for his offenses and was prepared to suffer the consequences of a judgment of death.” Id., 222 Cal.Rptr. 13, 710 P.2d at 927. He also didn’t want a long drawn-out jury trial. He didn’t want “to waste his time listening to trial counsel ‘yak’ about *1136 which prospective jurors were opposed to the death penalty and which were not.” Id., 222 Cal.Rptr. 13, 710 P.2d at 928.
Although the California Supreme Court affirmed the convictions and life sentences, it reversed the death sentence, holding that counsel’s honest, but mistaken, belief that he should not present mitigating evidence because of his client’s wish to present no evidence nevertheless denied Deere effective assistance of counsel. Id., 222 Cal.Rptr. 13, 710 P.2d at 931-34. The case was remanded for a new penalty phase trial.
In 1986, Judge Metheny convened the penalty phase trial. Again, Deere was lucid and understood the proceedings. Deere consistently reaffirmed his jury trial waiver and opposition to mitigating evidence.[4] Judge Metheny found Deere competent and the waiver knowing:
THE COURT: Very well.... The court does find at this time that Mr. Deere — as he did the last time — completely understands what we’ve discussed. I’ve never had any doubt about his intelligence and ability to understand. I think he’s made his decision fairly based on the facts we’ve discussed this morning.
At the continued hearing, Mr. Jones added:
I have discussed in detail with Mr. Deere his desires and he’s made them very clear to me. He does not change his position in any matter. He previously waived jury trial and continues to waive jury trial. He wants nothing to do with the jury trial. And I believe he’s satisfied with the way I’ve handled the case. He’s certainly indicated nothing to me that he’s dissatisfied in any way, shape, or form with my performance.
Judge Metheny then directly addressed Deere to make sure that Deere understood and continued to waive his right to a jury trial:
THE COURT: You know originally we went through this before in great *1137 detail that you had a right to the jury and you had a right to have the jury decide if you were found guilty of first degree murder. Then the jury would decide according to the aggravating and mitigating circumstances. You did waive that. The last time you were in here, just a few weeks ago I asked you again. I don’t mean to be facetious about this. I just want to have this done fairly. And I can assure you, and I want the record to reflect this, that I haven’t made up my mind yet at all.
I’m going to have to listen to the evidence. I can assure you I’m going to be fair. If I felt otherwise, I would not go any further with this case.
I’m asking you right now, Mr. Deere, if you want us to pick a jury and go back to the aggravating and mitigating circumstances?
THE DEFENDANT: No. I’m satisfied the way it is right now. I don’t want a jury.
The prosecution offered only the aggravation evidence presented in the first trial. Despite the fact that the case had been remanded due to ineffective assistance of counsel for Mr. Jones’s failure to set forth mitigating evidence, Mr. Jones again refused to put on any mitigation. Mr. Jones said, “[a]s I indicated during the first trial from day one Ronnie Deere has told me exactly how he wants this case to be handled. He’s never changed once.” Mr. Jones also re-affirmed that Deere was competent and rational:
He has convinced me that he knows what he’s doing. He’s not crazy. He’s not incompetent. He’s not insane. He knows exactly what he’s doing. He knows what he did to be convicted of these crimes and he knows — or he believes in his heart that justice should be done.
Mr. Jones repeated that Deere did not want a trial or evidence:
He does not want any evidence presented on his behalf because in his heart that is his private life and to bring that evidence into court would violate his relationships with everybody he holds dear and respects in the world. And to him, those relationships are more important than anything else, including his life.
Although the judge threatened Mr. Jones with contempt if he didn’t present mitigation, Mr. Jones reaffirmed that contempt would not change his mind. Mr. Jones again explained that Deere had “slowly but surely convinced” him not to present evidence. He believed Deere had “made his decisions consciously, temperately, and not in the heat of passion, but based on his true and sincere and honest beliefs about what is right for him.” After Mr. Jones again refused to admit mitigating evidence, Judge Metheny found the Riverside Public Defender’s Office and Mr. Jones in contempt and reinstated the death penalty.
Less than a month later, Judge Metheny stayed that order and appointed an attorney, Jonathan Landau, as a friend of the court, and an investigator, Richard Welby, to investigate and present mitigating evidence to the court. In addition, the California Supreme Court struck the “stayed” death sentence as “having been entered through inadvertence.”[5] After the state *1138 supreme court vacated the death penalty order, Judge Metheny vacated the contempt order.
At the continued hearing, now with Mr. Landau present as an amicus, Deere reaffirmed his jury waiver. Mr. Landau discussed the mitigation evidence from the preliminary hearing transcripts, and then presented six mitigation witnesses, including Dr. Bolger. Dr. Bolger opined that Deere suffered from diminished capacity at the time of the murders because he was under the influence of alcohol or drugs, stressed and traumatized. Dr. Bolger testified that, although Deere had a hard time expressing his remorse, he was “extremely remorseful over the death of the two children” and “the influence that this whole thing would have upon his daughter.” Dr. Bolger also believed that Deere could be of benefit to himself and society if spared the death penalty and imprisoned for life instead.
Investigator Welby testified about his investigation, adding that he had found that Deere cared about his mother and father and never forgot a birthday or holiday. A neighbor testified that Deere had helped her with yard work. Deere’s sister testified that Deere was upset at the time of the murders because of his deteriorating relationship with Cindy. Deere loved his daughter, had been a protective brother and had never been violent. Deere’s mother testified that she loved her son and wanted him to live. Finally, Mr. Landau introduced a piece of Deere’s art to show the work he could accomplish in prison.
After Mr. Landau argued that life in prison would be more punishment than a death sentence, Deere asked to respond. This is what he said:
THE DEFENDANT: I’d like to make a statement due to his saying about my being in prison for life. That that would be punishment, you know.
THE COURT: A punishment to you?
THE DEFENDANT: I understand what he’s saying. I don’t think he really knows much about prison life. He’s going by hearsay. I’m going to state something that I’m pretty sure that if they want to check it out they can check it out with the guards.
Being in prison for all your life for the rest of your life — don’t think I do without the luxuries on the streets. I drink every Friday night, every Saturday night. I smoke my weed everyday. You tell me how being in prison the rest of my life is really a punishment. I see my old lady every week. If I get married then I get contact visits. So he doesn’t really know what punishment is. I go to the yard seven days a week. I sit there if I got a hangover, then I’ll go out.
How can he say — he’s never been there. He doesn’t know what he’s talking about. How does that benefit society? I committed a crime punishable by death. I’m not looking at as an eye for an eye. I didn’t write the law. The law stated I committed a crime punishable by death. Not sitting there for the rest of my life which costs taxpayers a lot of money.
I’m sitting in there doing what I did out here. I smoke weed everyday. You can ask any guards there. They will verify that. Whatever is out there is in here. I make money off my artwork. I make thousands of dollars off my artwork. It doesn’t hurt me a bit to pay the money for drugs or drinking. I live comfortable.
If they think that’s punishment, then you go ahead and make your decision from that. I can live a life like that. The rest of my life.
When Judge Metheny responded that he had to “make a decision based upon the evidence,” Deere added:
*1139 I believe in justice. I believe Kathy has a right to justice. I don’t look at this as an eye for an eye. I don’t think two wrongs make a right. I look at it as the law stated. I committed a crime punishable by death. I should have been punished a long time ago by that law.
Mr. Jones then argued for a life sentence because of the absence of aggravating circumstances and the stress Deere was under at the time of the offenses. Judge Metheny weighed all of the mitigating and aggravating evidence and again sentenced Deere to death.
On May 2, 1991, the California Supreme Court affirmed the convictions and death sentence. Deere, 280 Cal.Rptr. 424, 808 P.2d at 1195. Different appellate counsel, again appointed by the state supreme court for the automatic direct appeal, argued that counsel was ineffective for failing to investigate competence in light of the fact that Deere was despondent, had cut himself and was suicidal. Id., 280 Cal.Rptr. 424, 808 P.2d at 1186. The California Supreme Court rejected the ineffective assistance claim, reaffirming its prior holding that Deere’s history of cutting of himself with razor blades when his girlfriend threatened to leave and asking Kathy Davis to kill him two days before the murders did not establish that he was incompetent to plead guilty or stand trial. Id. The court said:
[NJothing at the penalty retrial suggested that the state of defendant’s mental competence had changed for the worse.
Indeed, the trial court inquired of defendant directly on several occasions whether he wished to waive his right to a jury trial. In each instance, defendant responded clearly and unequivocally that he did. The trial court also observed for the record that defendant appeared to be rational and intelligent.

Id.

The California Supreme Court also affirmed the death sentence, holding that Judge Metheny “proceeded with a careful and detailed analysis of the evidence relevant to the penalty determination, with specific reference to the statutory mitigating and aggravating factors.” Id., 280 Cal.Rptr. 424, 808 P.2d at 1190. After listing all of the evidence considered by Judge Metheny, the California Supreme Court held that “the record leaves no doubt that the court’s sentencing decision was guided by clear and proper standards.” Id.
Deere filed his first petition for writ of habeas corpus in federal court on May 18, 1993, and amended the petition on July 11, 1994, claiming, among other things, that he was incompetent to plead guilty and that Mr. Jones rendered ineffective assistance of counsel in failing to establish his incompetence. In support of these allegations, Deere’s habeas counsel furnished a new report from Dr. Jones and the report of Frank Rosenthal, Ph.D., M.D., a psychiatrist. In a December 1, 1993 affidavit, signed 11 years after the convictions, Dr. Jones opined that:
Mr. Deere was competent in the limited sense of knowing what was going on around him, so that he understood the nature of the criminal proceedings; however, Mr. Deere’s mental disorders rendered him unable to assist counsel in the conduct of a defense in a rational manner. Mr. Deere’s initial refusal to cooperate with my evaluation of him and his eventual failure to complete the testing were themselves indicators of his inability to rationally cooperate in the presentation of a defense. Mr. Deere simply was not able to make logical judgments about his defense, rather, he had a compulsion to be punished with the death penalty and did not want any *1140 one to interfere with that. Mr. Deere’s insistence on pleading guilty was part of that compulsion and an outgrowth of his mental disturbances, it was irrational. It did not appear to me that Mr. Deere was capable of making a knowing, voluntary, intelligent decision to so plead.
‡ ^ $
In sum, it appeared to me that Mr. Deere was so bent on self-destruction that it disabled him from cooperating in a meaningful way with the presentation of a defense and caused him to solicit the death penalty.
Deere v. Woodford, 339 F.3d 1084, 1085 (9th Cir.2003) (Deere I). Dr. Jones later testified at his deposition that Deere’s desire to accept responsibility for his crimes “was probably substantially based on the self-destructive aspect of his personality.”
Hired by habeas counsel, Dr. Rosenthal came on the scene in 1992 and examined and tested Deere 10 years after the conviction. Dr. Rosenthal agreed with Dr. Jones that Deere could not “rationally” assist in his defense in 1982 because of his “compulsion to be punished with the death penalty” and self-destructive personality.[6]
The district court (Judge Gary Taylor) denied Deere’s habeas petition, and did so without holding an evidentiary hearing. The court held that the state trial court’s finding that Deere was competent was presumed correct and was supported by the record. The court reasoned that the attorneys, mental health experts and trial judge all found Deere competent; Dr. Bolger’s 1982 conclusions were consistent with the 1982 report of Dr. Jones; the crimes did not show incompetence; and Deere’s behavior in 1982 and 1986 did not provide any evidence of incompetence. Judge Taylor concluded that there was no evidence before the trial court to require a competence hearing.
The district court held that the newly-obtained mental health opinions, made 10 years after trial, could be considered, but that those opinions did not compel the rejection of the finding of Deere’s competence. Both Drs. Jones and Rosenthal based their opinions on what they deemed to be Deere’s unreasonable decision not to put on a defense. However, they agreed that Deere was competent in the sense that he understood the nature of the proceedings. The fact that Deere desired an outcome that the doctors believed to be irrational, Judge Taylor reasoned, did not make Deere incompetent to plead guilty.
In his habeas petition, Deere also claimed that he was denied due process because, he said, Judge Metheny was himself not mentally competent in 1986. Deere sought discovery and an evidentiary hearing on this point. The district court denied this claim, reasoning that the record as a whole did not show any evidence that Judge Metheny was incompetent, and none of the attorneys, not Mr. Jones, not Mr. Landau, not the prosecutor, who were in the best position to assess competence, ever moved to recuse the judge. Although Judge Metheny may have made an initial misstep when confronted with Mr. Jones’s refusal to present mitigation after the case had been remanded for exactly that purpose, any error was understandable given the novel nature of the circumstances. This did not show mental incompetence.[7]
*1141 The district court denied the habeas petition in its entirety and Deere appealed. In 2003, the first time this case was before us, we remanded it for an evidentiary hearing on the question of Deere’s competency to plead guilty and the claims premised on that issue. We wrote that:
[W]e agree with Deere that he came forward with sufficient evidence at least to trigger a hearing on whether he was, in fact, competent to have pleaded guilty. We do not quarrel with the district court’s statement that Dr. Rosen-thal’s “conclusions cannot be awarded as much weight as that given to Dr. Jones’ examination which occurred around the time of the trial.” Belated opinions of mental health experts are of dubious probative value and therefore, disfavored. See Williams, 306 F.3d at 706. (“[W]e disfavor retrospective determinations of incompetence, and give considerable weight to the lack of contemporaneous evidence of a petitioner’s incompetence to stand trial.”) (citation omitted).
Dr. Jones’s declaration, however, stands on different footing. It is based on his two examinations of Deere, which he performed in 1982, within several days of when Deere pleaded guilty. It is, therefore, probative of Deere’s mental status at the critical time. Dr. Jones also offered a reasonable explanation for why he did not render an opinion on Deere’s competency right then and there: He was told by Lawyer Jones not to. Viewed together, the declarations of Drs. Jones and Rosenthal “create a real and substantial doubt” as to Deere’s competency to plead guilty, if they are taken at face value and assumed to be true.
We express no opinion on how the district court should weigh the evidence after hearing it. We simply hold that a hearing was required. We remand to the district court with directions to hold a hearing on Deere’s claim that he was incompetent to plead guilty, and to reconsider the petition for writ of habeas corpus as to the claims premised on that contention. This court will rule on the other issues raised in petitioner’s appeal if and when the case is re-appealed.
Deere, 339 F.3d at 1086-87.
Judge Snyder took over the case from Judge Taylor and conducted an evidentia-ry hearing in 2007. Deere v. Cullen, 713 F.Supp.2d 1011, 1015 (C.D.Cal.2010).
At the evidentiary hearing, Dr. Jones testified that he examined and tested Deere for a total of two hours in 1982. His 1982 diagnosis of borderline personality disorder was supported by Deere’s self-mutilation and suicidal behavior. That same self-destructive behavior motivated Deere to seek the death penalty and waive presentation of mitigating evidence. Dr. Jones opined that Deere “[knew] what was going on around him so that he understood the nature of the criminal proceedings” in 1982. But, Dr. Jones opined, Deere was “unable to assist counsel in the conduct of a defense in a rational manner” in 1982. In other words, Deere was “strongly motivated” to seek the death penalty by his self-destructive needs.
Dr. Jones testified he “had reservations about” Deere’s competence in 1982 be *1142 cause of Deere’s “self-destructive behavior.” But, Dr. Jones did not “arrive at ... an opinion with respect to Deere’s competency” in 1982. Dr. Jones testified that he advised Mr. Jones in 1982 that Deere’s decision to plead guilty was a continuation of his impulsive lifestyle. However, Dr. Jones stated in his deposition that he could not remember if he advised Mr. Jones in 1982 that Deere might not be competent.
Armando Favazza, M.D., testified that habeas counsel hired him in 2004, 22 years after the guilty plea, to assess Deere based on the records. Dr. Favazza never met with or tested Deere, but nevertheless opined at the evidentiary hearing that he would not have diagnosed the borderline personality disorder (the diagnosis made by both Dr. Bolger and Dr. Jones). Instead, he would have diagnosed mild to severe depression. Alcohol abuse, he opined, makes it difficult to diagnose personality disorders. According to Dr. Fa-vazza, Deere had “a pathological fixed idea that he must be killed.” This “fixed idea” “prevented [Deere] from cooperating with his counsel.” Dr. Favazza admitted, though, that the Diagnostic and Statistical Manual IV, commonly known as the DSM IV, does not recognize a mental illness of “fixed” or “pathological” death wish.
Dr. Rosenthal testified that he had been hired to evaluate Dr. Bolger’s qualifications and procedures. Based on Dr. Bol-ger’s two reports, his 1986 testimony and a 1986 deposition, Dr. Rosenthal testified he didn’t think Dr. Bolger had formally trained or was otherwise well-trained in psychiatry. Dr. Rosenthal stated, “[Dr. Bolger] did claim to be board certified in one of his transcripts which I find very troubling because the letter in the files that I was provided from the board, the American Board of Psychiatry indicating that Dr. Bolger had never been certified by that board.”[8] Therefore, he did not believe that Dr. Bolger’s report could be reliable.
Dr. Pablo Stewart, a psychiatrist who had never met or tested Deere, was hired by habeas counsel in 2006, 24 years after Deere pled guilty. He opined that Deere suffered from post-traumatic stress disorder (PTSD) and possibly organic brain syndrome. Dr. Stewart acknowledged that the same symptoms used to diagnose PTSD can establish a borderline personality disorder. It was unclear, Dr. Stewart testified, whether Deere had a major depressive disorder. Dr. Stewart opined that Deere’s plea was “colored by” his “psychiatric condition.” In other words, Deere’s mental health “inhibited” his ability to think rationally.
The state’s expert, Park Dietz, M.D., Ph.D., did not meet with or examine Deere, but not because he didn’t try. The parties stipulated, and Judge Snyder ordered, that Dr. Dietz would examine Deere at the prison, but Deere refused to cooperate. Dr. Dietz has been a board-certified psychiatrist since 1979. He specializes in forensic psychiatry. Dr. Dietz agreed with both Drs. Jones and Bolger that Deere had borderline and anti-social personality disorders. The borderline personality disorder diagnosis was supported by Deere’s history of cutting himself; pattern of unstable personal relationship; marked im-pulsivity; frantic efforts to avoid real or imagined abandonment; unstable self-image; substance abuse; self-mutilation; emotional instability and inappropriate, intense anger. The anti-social personality disorder was similarly supported by the record. Anti-social personality disorder, which previously would have labeled Deere a sociopath, is not a psychotic state.
Dr. Dietz concluded that the 1982 and 1986 observations of Dr. Jones, defense *1143 counsel and Dr. Bolger established that Deere was competent to plead guilty in 1982. Specifically, Dr. Dietz opined:
[Deere’s] decisions were not made once, without thinking, in an impulsive manner. They were repeatedly and consistently made over a period of time where he heard alternative view points, was educated about his options, had someone making an effort to persuade him to take a different course of action, and during which Mr. Deere himself articulated his reasons for acting as he was wishing. And articulated his personal values and beliefs that were the basis for his decision. That’s not impulsivity and that’s not even the way borderline personalities make their decision when they’re being symptomatic.
Dr. Dietz stated that the “idea of execution or death is undesirable” to most people. But he added:
In Mr. Deere’s case, he indicated that he had other values and goals that in his eyes made it self-serving for him to seek and even desire that he be executed. And those included his expressed desire to demonstrate his humanity, his expressed sense of justice, his expressed desire to spare further pain to his family and to his victims’ family. And his expressed desire to accept responsibility for his crimes.
If we credit him with the ability to hold those values and to espouse those goals and to care more for living in those ways in the brief span until execution, than for the value of life itself, then we would have to say that in his case he is asserting his goals in the service of himself that to him outweigh the obvious self-destructive function of permitting oneself to be executed.
Dr. Dietz said that “self-harm syndrome” or life-long death wish diagnosis is not a diagnosis recognized by the American Psychiatric Association or listed in the DSM IV. In any case, Dr. Dietz said that the same symptoms support the borderline personality disorder diagnosed by Drs. Jones and Bolger.
Dr. Dietz disagreed with Dr. Jones’s 1993 opinion that Deere had an “irrational compulsion” to seek the death penalty. Dr. Dietz opined that even repeated suicide attempts do not warrant a diagnosis of a “compulsion” as the term is used in psychiatry. He said that the evidence in this case did not rise to the level of a compulsion.
After the evidentiary hearing, the court found that there was “no conclusive understanding of the nature and degree of [Deere’s] mental illness.” It then offered Deere an opportunity to provide additional evidence to establish that a mental illness prevented him from assisting in his defense. Although the parties agreed that two experts, Drs. Stewart and Dietz, would jointly examine Deere, Deere again refused to cooperate. Therefore, the court ruled without the additional evidence. Deere, 713 F.Supp.2d at 1015-16.
The district court granted the habeas petition on the grounds of ineffective assistance of counsel. The court held that Mr. Jones had performed below the objective standard of reasonableness in failing to request a full-blown competency hearing before Deere pled guilty. Id. at 1029-30. Further, it also held that Deere was prejudiced by this failing because there was a reasonable probability that he would have been found incompetent had Mr. Jones adequately developed the issue at the time of Deere’s guilty plea. Id. at 1041. Notably, having decided the case on this basis, the court specifically declined to “reach Deere’s claim of actual incompetence.” Id.
In coming to this conclusion, the court rejected Dr. Bolger’s 1982 opinions, finding that “Dr. Bolger had no formal psychi *1144 atric training whatsoever,[9] misrepresented to the Court that he was board certified, and failed to disclose” that he “had a prior relationship with Deere’s father as his treating physician and had previously interviewed Deere in that capacity.”[10] Id. at 1023, 1034. The court gave “substantial weight” to Dr. Jones’s 1992 opinion, but also considered the expert opinions of Drs. Favazza, Stewart and Dietz. Id. at 1036.
The district court vacated Deere’s convictions and sentences, id. at 1043, but stayed the order pending appeal. The state timely appealed.
II. Jurisdiction and Standards of Review
We have jurisdiction pursuant to 28 U.S.C. § 1291. We review the district court’s grant or denial of the habeas claims, the ineffective assistance of counsel claims and competence claims de novo. We review a district court’s findings of fact for clear error and the district court’s refusal to hold an evidentiary hearing for an abuse of discretion. Williams v. Wood-ford, 384 F.3d 567, 586, 608 (9th Cir.2004).
State court findings of fact, including findings made by appellate courts based on reviews of the record, are entitled to a presumption of correctness and are reviewed for clear error. 28 U.S.C. § 2254(d)(8) (1996); Sumner v. Mata, 449 U.S. 539, 545-47, 550, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981); Jeffries v. Blodgett, 5 F.3d 1180, 1187 (9th Cir.1993).
The Antiterrorism and Effective Death Penalty Act does not apply to this habeas petition because the original petition was filed in 1993. Williams, 384 F.3d at 586. Thus, we grant habeas relief if Deere proves by a preponderance of the evidence that he “is in custody in violation of the Constitution or laws or treaties of the United States.” 28 U.S.C. § 2254(a) (1996).
III. Deere’s competence to plea guilty and stand trial and related ineffective assistance of counsel claim
Many of Deere’s claims revolve around his competence during the 1982 and 1986 proceedings. Deere was competent to plead guilty and stand trial if he had “sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding” and “a rational as well as factual understanding of the proceedings against him.” Godinez v. Moran, 509 U.S. 389, 396-98, 113 S.Ct. 2680, 125 L.Ed.2d 321 (1993); Drope v. Missouri, 420 U.S. 162, 172, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975); Dusky v. United States, 362 U.S. 402, 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960) (per curiam).[11] Competence “has a modest aim: It seeks to ensure that [the defendant] has the capacity to understand the proceedings and to assist counsel.” Godinez, 509 U.S. at 402, 113 S.Ct. 2680.
*1145 The state courts’ repeated findings that Deere was competent to plead guilty and stand trial in 1982 and 1986 are presumed to be correct if they are fairly supported by the record. Demosthenes v. Baal, 495 U.S. 731, 735, 110 S.Ct. 2223, 109 L.Ed.2d 762 (1990); Maggio v. Fulford, 462 U.S. 111, 116-17, 103 S.Ct. 2261, 76 L.Ed.2d 794 (1983) (per curiam); Evans, 800 F.2d at 887. No formal evidentiary hearing is required for the presumption to apply. Mata, 449 U.S. at 545-46, 101 S.Ct. 764. Deere must come forward with clear and convincing evidence to rebut the presumption. Id. at 550, 101 S.Ct. 764.
The question on this aspect of the case boils down to this: whether Deere suffered any prejudice from the lack of a competency hearing, even assuming for the sake of argument that Mr. Jones should have moved for one? Put another way, was there a reasonable probability that he would have been found incompetent to plead guilty? Strickland v. Washington, 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); Stanley v. Cullen, 633 F.3d 852, 862 (9th Cir.2011). We review this question on a de novo basis. Williams, 384 F.3d at 586. After carefully reviewing the record, including the district court’s factual findings that we accept as true, we hold that there is no reasonable probability that Deere would have been found incompetent to enter his plea.
Furthermore, the state court’s finding that Deere was in fact competent is presumed correct and has not been rebutted by clear and convincing evidence. Evans, 800 F.2d at 887. First, all of the mental health experts, even the Johnnyeome-latelies, agree that Deere had the ability to understand and actually understood the nature and object of the proceedings against him.[12] The reports of both mental health experts who examined Deere in 1982 establish that Deere understood the proceedings and was able to cooperate with counsel. The reports of Drs. Bolger and Jones are remarkable for the similarity of their conclusions. Both doctors opined that Deere understood the proceedings, was oriented to time, place and person and was free of thought disorders. Both experts diagnosed Deere with substance abuse and personality disorders with antisocial aspects. Dr. Jones also diagnosed adjustment disorder. No mental health expert has ever found Deere to be delusional, paranoid or psychotic. Dr. Bolger also opined that Deere was capable of working with counsel if it benefitted him to do so.
In 2010, Judge Snyder found that Dr. Bolger, who had died 23 years earlier and was no longer around to defend himself, was not a competent psychiatrist. Never mind that Bolger trained in psychiatry at a state hospital for several years, was the staff psychiatrist at a state prison for several years more and had a private psychiatric practice after that. Even if the court’s finding about Dr. Bolger is entitled to deference, it is of little moment since Bolger’s 1982 opinions were in almost complete lockstep with Dr. Jones’s 1982 opinions and entirely consistent with the observations of the judge and counsel. And those observations come down to this: Deere knew what he was doing and had rational reasons for doing it.
Second, Judge Metheny personally interacted with Deere on numerous occasions at every hearing and repeatedly found that Deere understood the proceedings and could cooperate with counsel in a *1146 defense. During these interactions, Deere was lucid, appropriately answered open-ended questions, and established his understanding of the proceedings and his ability to consult with counsel. To repeat, the state court’s finding that Deere was competent is not only strongly supported by the evidence, but presumed correct because “competency determinations necessarily involve assessments of credibility and demeanor” by the trial judge, and “competency may be examined in open court on a full record.” Evans, 800 F.2d at 887. Judge Metheny repeatedly observed and evaluated Deere’s competence in 1982 and 1986. His observation that Deere was competent is presumed correct and strongly supported by the record. Id.; Maggio, 462 U.S. at 117-18, 103 S.Ct. 2261. It certainly has not been rebutted by clear and convincing evidence.
Third, defense counsel, who spent a great deal of time discussing the issues with Deere, had no doubt that Deere was legally competent, rational and could cooperate in his defense if he wanted to. Although’s Deere’s psychiatric diagnosis is a medical question, his competence to plead guilty is a legal one that judges and lawyers deal with all the time. Deere and Mr. Jones conferred for countless hours before the plea was entered. It was apparent to Mr. Jones that Deere understood the proceedings and his various options but wanted to plead guilty for the reasons already stated: he wanted to spare his family; he wanted to minimize the trauma to the survivors; and he thought a guilty plea and possible death sentence was just under the circumstances. These are not irrational considerations. Mr. Jones was uniquely positioned to assess Deere’s ability to understand the proceedings and his legal options. Medina v. California, 505 U.S. 437, 450, 112 S.Ct. 2572, 120 L.Ed.2d 353 (1992); Williams, 384 F.3d at 606. Thus, Mr. Jones’s opinion is “especially relevant” and provides “significant evidence” that Deere was competent. Williams, 384 F.3d at 608.
Fourth, the prosecutor believed that Deere was competent in 1982 and 1986.
Fifth, the facts of the crimes do not suggest legal incompetence or someone out of touch with reality. Deere repeatedly threatened to kill Cindy’s family. Then, after she left him, he planned the murder for a few days, again warned Cindy and then carried out that murder.
Sixth, the transcripts of the guilty plea proceedings establish that Deere actually understood what was going on. Deere accurately answered open-ended questions from the judge, consulted with his counsel in court and demonstrated his understanding of the proceedings, his waivers and the possible results of his actions. He was articulate, repentant and logical in the courtroom. Deere’s “comprehension of the legal significance” of his actions, including the withdrawal of his not guilty plea, “indicated that he had the ability to consult with his attorney with a reasonable degree of rational understanding.” Williams, 384 F.3d at 605.
Finally, as noted already, Deere had rational reasons for pleading guilty. As the California Supreme Court found, Deere “felt great remorse for his offenses and was prepared to suffer the consequences of a judgment of death.” Deere, 222 Cal.Rptr. 13, 710 P.2d at 927.
Eleven years after Deere pled guilty, habeas counsel came forward with newly-obtained opinions to the effect that Deere’s plea was motivated by an irrational desire to be put to death, rendering him incompetent and his plea invalid, whether or not he understood his situation and the ramifications of his decision. This evidence is of little consequence for two reasons:
First, as we pointed out in Deere I, “[bjelated opinions of mental health ex *1147 perts are of dubious probative value and therefore disfavored.” 339 F.3d at 1086.
Second, even if these belated opinions are credited, what matters is not whether Deere had a mental illness that affected his decision, but whether he had a mental illness that affected his capacity to understand his situation and make rational choices. Dennis v. Budge, 378 F.3d 880 (9th Cir.2004), involves a case with strikingly similar facts. Dennis pled guilty to capital murder and was sentenced to death. He sought and was granted leave to withdraw his state habeas appeal. Id. at 882-83. A “next friend” federal habeas petition was filed arguing that Dennis was incompetent to have made these decisions due to mental illness. Id. at 886-87. A psychiatrist opined that Dennis “killed the victim and is seeking the death penalty as a convenient way out of life, and a way of assuring himself that ultimately he will die.” Id. at 883. Nevertheless, the psychiatrist opined that Dennis had sufficient understanding of the proceedings to consult with counsel and had a rational and factual understanding of the proceedings. He was fully aware of the charges, the implications of the sentence, and the legal options available to him. Id. We held:
The question ... is not whether mental illness substantially affects a decision, but whether a mental disease, disorder or defect substantially affects the prisoner’s capacity to appreciate his options and make a rational choice among them ... A “rational choice” does not mean a sensible decision, or a decision that the next friend regards as reasonable.
Id. at 890 (emphasis in original).
Thus, because it is undisputed that Deere was fully aware of his situation and had rational reasons for his desire to plead guilty — in other words, that he had “the capacity to appreciate his options and make a rational choice” — it is not reasonably probable that he would have been found incompetent to plead guilty under the proper legal standard, even if his new-found experts had opined at a competency hearing in 1982 as they do now. We reverse Judge Snyder’s order granting a writ of habeas corpus on this ground.[13]
We now turn to the order issued by Judge Taylor denying habeas relief on the other grounds raised by Deere.
IV. Trial judge’s mental competency in 1986
Deere argues that the district court abused its discretion by denying his request for discovery and an evidentiary hearing on his claim that counsel was ineffective for not challenging Judge Metheny’s competency to preside at the 1986 *1148 penalty retrial. We review the district court’s denial of an evidentiary hearing for an abuse of discretion. Williams, 384 F.3d at 586. The district court must conduct an evidentiary hearing if the facts are disputed, the facts alleged would entitle the petitioner to habeas relief, if true, and if the petitioner did not receive a full and fair opportunity to develop the facts in state court. Id.
We hold that the district court did not abuse its discretion in finding that Deere did not come forward with sufficient evidence to warrant an evidentiary hearing on this issue.
The essence of Deere’s claim is that in 1986, Judge Metheny was senile and that Mr. Jones rendered ineffective assistance of counsel in failing to attempt to disqualify him. Deere’s habeas counsel admit that they did not have enough proof to sustain this claim, but they argue they came forward with enough to entitle them to discovery and an evidentiary hearing. They offered the following:
1.After the case was remanded by the California Supreme Court for the presentation of mitigating evidence, and after Mr. Jones still refused at Deere’s insistence to offer mitigation, Judge Metheny held Mr. Jones in contempt and reimposed the death sentence. He then purported to “stay” the sentence and appointed a private investigator to develop mitigation. Mr. Jones objected to this, and ultimately the California Supreme Court struck the order and returned the case to the trial court for the presentation of mitigating evidence.[14] When the case went back to Judge Metheny, he appointed Mr. Landau as a friend of the court and mitigation was developed and presented. Deere argues that Judge Metheny’s ruling is evidence of not just legal error, but mental impairment.
2. Deere also points to certain statements Judge Metheny made at the time of sentencing as indicative of mental impairment. Deere argues that Judge Metheny “employed bizarre reasoning” by comparing Deere’s murders to mafia hits,[15] soldiers shooting enemies during the war and individuals shooting judges.[16] The judge also compared Deere to himself, noting that he was angry when he lost a girlfriend during the war.
3. Deere also furnished declarations from four lawyers. Taylor Huff signed a declaration in 1993. He is a former public defender in Indio. He furnished a copy of a ruling Judge Metheny made in 1985 on a motion to suppress that Huff offered as proof of the judge’s mental impairment. However, there is no explanation of how the ruling evidenced mental impairment or even in what way it was wrong. Huff *1149 expressed his opinion that Judge Metheny had difficulty grasping the legal concepts involved in that case, but provided no details. Huff also offered his opinion that Judge Metheny’s faculties seemed to have deteriorated over the years. Huff declared that he had appeared before Judge Metheny five to ten times, but never sought his disqualification.
Michael Kennedy, a public defender in San Bernardino County, furnished a declaration in 1993 stating that he had heard “rumors” as early as 1985 that the judge had Alzheimer’s Disease. Kenney states that in 1988 — two years after Deere was resentenced — he saw Judge Metheny, a former college football player, come down from the bench after an evidentiary objection, assume a football stance and challenge him. Kennedy speculates that Judge Metheny was having a flashback to his days as a college football player. After Kennedy moved for Judge Metheny’s disqualification, Metheny “appeared to snap back into the present” and apologetically disqualified himself. Kennedy had never appeared before Judge Metheny prior to 1988.
Mark Sullivan declared in 1993 that in 1984 Judge Metheny made “strange rulings and off-hand remarks” in a civil case. In 1986, Judge Metheny was presiding over a small claims appeal that was only supposed to have taken a couple of hours. When it dragged on for three days, Judge Metheny, apparently exasperated, came down from the bench, said that both sides were good Christian people, that they should settle the dispute, and then he dismissed the case. The matter was reinstated by the presiding judge. Sullivan stated that in his opinion, Judge Metheny was not competent to handle the responsibilities of a judge since 1983.
Finally, Diane Samuelson, one of Deere’s current habeas counsel, furnished a declaration stating that in 1993 — seven years after Deere’s sentencing — she unsuccessfully attempted to contact Judge Metheny. Ultimately, she received a phone call from someone who identified herself as his wife who told Samuelson that the judge was ill, couldn’t remember cases anyway, and had an Alzheimer’s-type condition.
As noted above, the district court denied the request for discovery without prejudice,[17] balancing this new evidence against the fact that neither Mr. Jones nor Mr. Landau ever moved to recuse and the fact that the California Supreme Court reviewed the record and found that the trial judge was fair, objective and carefully weighed mitigating and aggravating factors at sentencing. Evidence obtained 11 years after the sentencing, the district court reasoned, would not establish the judge’s competency in 1986. Although the request for discovery was denied without prejudice, the request was never renewed.
The district court also denied the request for an evidentiary hearing because the evidence proffered, when viewed along with “the entire record,” did not support Deere’s allegation that the judge was incompetent. None of the attorneys who actually appeared before Judge Metheny in this case — Mr. Jones, Mr. Landau, the prosecutor and appellate defense counsel— ever questioned the trial judge’s mental competence. These lawyers, the district court added, were in the best position to observe the trial judge’s behavior. In addition, although Judge Metheny may have initially erred in his handling of Mr. Jones’s refusal to put on mitigation, the district court noted, “the fact that all the *1150 parties were breaking new ground in this case ... It is rare that a defendant pleads guilty in a death penalty case, and Petitioner created a novel dilemma when he declined to present any mitigating evidence.” Neither the judge nor parties had experience with the novel situation.
We hold that the district court did not abuse its discretion in denying an eviden-tiary hearing on the subject of Judge Metheny’s mental competency in 1986. First, with respect to Judge Metheny’s ruling when Mr. Jones refused to put on mitigation, a ruling later reversed, there is simply no evidence — none—that this ruling was other than legal error committed when the judge was confronted with a highly unusual situation. Mr. Jones refused to present mitigation in a capital case even after the case had been remanded by the California Supreme Court for that very purpose, even on pain of contempt. Judge Metheny was sailing in un-chartered waters. His procedure of reimposing the death penalty, and then staying it for further mitigation was error. After this error was corrected on appeal, the case was remanded to Judge Metheny and it proceeded to conclusion without further ado and it was affirmed on appeal. Legal error, especially in the context of highly unusual circumstances, is not evidence of senility.
The out-of-context excerpts of Judge Metheny’s remarks at Deere’s 1986 sentencing prove only that Judge Metheny was not the most articulate of men. However, when Judge Metheny’s remarks are read in context and not in isolated snippets, it is apparent that he was trying to make the legitimate point that he could empathize with Deere about the pain of being jilted by a girlfriend. He was also explaining that he had to consider the facts of the crimes to determine the sentence. He was making the point that Deere committed an emotional crime, rather than a murder for hire. And that even though Deere was intoxicated and upset, he had nevertheless planned the murder; it was not an accident, like drunk driving, nor was it a spur-of-the-moment killing.[18]
Although Deere’s lawyers argue that Judge Metheny’s remarks are evidence of mental impairment, conspicuously missing from their submission is anything from any of their doctors. Despite having access to a veritable stable of mental health professionals who could have reviewed the transcripts — Dr. Jones, Dr. Rosenthal, Dr. Favazza, Dr. Stewart — not one has opined that Judge Metheny’s statements are evidence of a disordered mind, or even that they warrant further inquiry.
The declarations of the lawyers recounting anecdotes also do not provide a basis for a hearing. Taylor Huffs declaration boils down to his personal opinion that Judge Metheny “had difficulty grasping” the legal concepts involved in a 1985 motion to suppress. Huff is certainly entitled to his opinion, but it is not proof of the judge’s mental impairment, especially since there is no specific explanation of what the problem supposedly was. Judge Metheny’s ruling attached to Huffs declaration is unremarkable on its face, and there is not even an allegation that it was *1151 ever found to be legally erroneous. Huffs declaration does not warrant a hearing.
Michael Kennedy’s declaration speaks of “rumors” he’d heard about Judge Metheny around 1985. Rumors do not warrant a hearing. The football incident occurred in 1988 — two years after Deere’s sentencing. At best, the football incident sheds light on Judge Metheny’s status at that time, not in 1986. In fact, Kennedy says he never even appeared before Judge Metheny until 1988. His observations two years after the time in question do not warrant a hearing.
Mark Sullivan’s declaration speaks of “strange rulings,” not otherwise identified, made by Judge Metheny in a civil case in 1984. It also recounts an inexplicable statement that the judge made to the jury to the effect that Sullivan’s wife had complained to the judge about Sullivan’s staying out too late at night. No transcript was furnished, so it is impossible to tell whether this statement was an attempt at humor, the product of confusion, or something else. In any event, this one stray remark, without any context in a 1984 trial, does not warrant a hearing. The 1986 event in which the judge abruptly dismissed a small claims appeal that was supposed to have taken just a few hours, but went on for three days, shows a judge who became exasperated and blew his stack. Although this is evidence of impatience, it is not hard to understand how or why the incident happened. Once again, Deere has failed to furnish anything from any of his several mental health experts ascribing any clinical significance to this incident.
The substance of Diana Samuelson’s declaration quoting the woman who identified herself as Judge Metheny’s wife in 1993 is hearsay. Even if it weren’t, the woman’s statements speak only to Judge Metheny’s condition in February 1993, and say nothing about his status in 1986.
Deere’s habeas counsel accuse Mr. Jones of ineffective assistance of counsel for failing to move to disqualify Judge Metheny, yet offer no evidence whatsoever that Huff, Kennedy or Sullivan ever shared their opinions of Judge Metheny with Mr. Jones or passed along the gossip and rumors they included in their declarations. In evaluating Mr. Jones, we look to what he knew in 1986. Strickland, 466 U.S. at 689, 104 S.Ct. 2052.
Finally, and most importantly, on May 2, 1991, the California Supreme Court affirmed, without dissent, Judge Metheny’s handling of the 1986 proceeding — the proceeding Deere now argues was affected by the judge’s mental impairments. Not only was Judge Metheny affirmed in toto, but the Supreme Court even specifically observed that “the record indicates that the trial court remained scrupulously fair and objective throughout the proceedings. It carefully weighed and considered both the aggravating and mitigating evidence after they were presented.” Deere, 280 Cal.Rptr. 424, 808 P.2d at 1195. Not only did the Supreme Court fail to express any concern over Judge Metheny’s statements or behavior, it explicitly commended him on the way he handled the case. This alone compels the conclusion that Judge Metheny was not impaired when he presided over this case in 1986, and that Mr. Jones was not ineffective in failing to seek his disqualification.
The dissent says, “The majority holds that a judge suffering from dementia may sentence a man to death.” We hold no such thing. What we really hold is that the anecdotes drummed up many years after the time in question do not support the claim that Judge Metheny was impaired in 1986, particularly in light of the California Supreme Court’s laudatory af-firmance of Judge Metheny’s supposedly-impaired 1986 rulings.
*1152 V. Conclusion
We REVERSE the district court’s grant of the petition for writ of habeas corpus on the ineffective assistance of counsel claim relating to the lack of a competency hearing, AFFIRM the district court’s denial of the petition on all other grounds[19] and REMAND for the district court to deny the petition for writ of habeas corpus.
AFFIRMED IN PART, REVERSED IN PART AND REMANDED.

. In 1986, Bolger testified in this case that he was board-certified in psychiatry and internal medicine. In 1987, he testified in a different case that he was not board-certified in any speciality. It is possible, of course, that Bol-ger intentionally lied in 1986. It is also possible that there was a transcription error or some other explanation for a statement that is so easily refuted. What is puzzling about this is the absence of any evidence in the record that Bolger, in a career that spanned 30 years, ever misrepresented his credentials in a job application, résumé, or testimony on any other occasion. In March, 2007, 20 years after Bolger died, the parties stipulated that Bolger was never board-certified, but the explanation for his 1986 statement — a deliberate falsehood or something else^ — remains a mystery.

. The degrees of murder were left for the judge to decide in a subsequent proceeding.

. MR. JONES: Your Honor, at this time we will not offer any evidence on the issue of degree. I've discussed the matter with Mr. *1134 Deere, and it is his specific instructions that we not call Dr. Bolger. His reasons are personal. He knows that Dr. Bolger would be revealing conversations he’s had with him, which he feels are private. And Dr. Bolger will be discussing family matters, Ronnie's childhood and his brothers and sisters and that sort of thing, and he’s instructed me we are not to call Dr. Bolger as a witness; and so at this time we would not offer any evidence.
THE COURT: I take it that’s what you want to do, Mr. Deere; is that right?
THE DEFENDANT: Yes.

. THE COURT: I assume, Mr. Deere, that you are willing and want to have Mr. Jones represent you—
THE DEFENDANT: Yes.
THE COURT: — from here on out again? THE DEFENDANT: Yes.
THE COURT: And do you understand what I told you about the Supreme Court's ruling to the effect that we have to continue with the trial?
THE DEFENDANT: Yes, I have read the report. I have one, too. I read it all. THE COURT: I don’t really believe we’re ready to go to trial today; do you, gentlemen?
MR. JONES: No, that’s correct, Your Hon- or ... I’ve discussed with Mr. Deere his desires, in terms of whether he wants a jury trial or a court trial. He clearly advised me he does not want a jury trial. His previous waiver of jury is still his desire.
THE COURT: Of course, you understand you have the right to have a jury trial, if you wish to have it.
THE DEFENDANT: Yes.
* * *
THE COURT: ... [The trial] will be limited to the mitigating and aggravating circumstances. You know what that means. I'm sure of that.
THE DEFENDANT: Yes.
THE COURT: And you have a right — and your attorney, Mr. Jones, will get this set up — you will have a right to put on the individuals who will testify for you as to mitigating circumstances. I will be the judge and the finder of fact on this particular question and issue as to whether the mitigating circumstances outweigh the aggravating circumstances.
That puts us in a position where the court has the responsibility to determine whether or not the sentence would be life imprisonment or whether it would be the death penalty, or there’s a possibility that there could be some other conclusion.
THE DEFENDANT: Yes.
THE COURT: Do you understand that?
THE DEFENDANT: Yes.
THE COURT: Do you have any questions?
THE DEFENDANT: No.

. A "Commitment Judgment of Death” was filed by the Clerk of Court on April 22, 1986. On May 14, 1986, Judge Metheny stayed the sentence to obtain mitigating evidence and scheduled a penalty hearing for June 27, 1986. In a May 19, 1986 minute order, Judge Metheny appointed Richard Welby, a licensed private investigator, to investigate for mitigating evidence. Citing the May 19 order, the California Supreme Court subsequently concluded that the April 22 judgment was "through inadvertence, prematurely filed.” It ordered the judgment stricken and returned the case to the trial court.

. Dr. Rosenthal did not testify about this 1993 report at the evidentiary hearing before Judge Snyder because he could not remember it. Dr. Rosenthal also testified that he could not “answer the question of whether Mr. Deere was competent.”

. The district court also rejected a sufficiency of the evidence claim for the first degree murder conviction and related ineffective assistance of counsel claim because Deere:
walked a great distance with the murder weapon, broke into the house to wait for Donald Davis to return, had considered the *1141 consequences for the homicide on a prior occasion, had threatened to kill the whole family, and had told others that he was going to do something....
Similarly, the district court held that counsel was not ineffective for not presenting mental state evidence because Deere was competent, adamantly opposed the evidence, refused to consider a plea of guilty by reason of insanity or mental health defenses and insisted on pleading guilty and seeking the death penalty against defense counsel’s advice. As Mr. Jones advised the court, he had an ethical duty to follow Deere’s wishes.

. See Note 1, supra.

. This finding is dubious because it is based on Dr. Rosenthal’s speculation about Dr. Bol-ger's training. The record simply does not contain details about the training beyond the fact that he trained and then was officially designated a psychiatrist in the California prison system.

. Specifically, Dr. Bolger had treated Deere's father for seizures at the Blythe hospital in 1981 and had taken a family history about the father’s alcoholism from Deere. Dr. Bolger's prior experience with the Deeres is not mentioned in his 1982 reports. In 1986, Bolger denied knowing Deere previously, but is not clear why Dr. Bolger should have been expected to remember in 1986 that he had met Deere five years earlier, before the events of this case, while treating his father.

.When Deere pled guilty in 1982, California applied the same competence standard. Cal.Penal Code § 1367 (1982); Deere, 222 Cal.Rptr. 13, 710 P.2d at 927; People v. Jablonski, 37 Cal.4th 774, 38 Cal.Rptr.3d 98, 126 P.3d 938, 961 (2006).

. As the Supreme Court explained in Godinez, competence requires only the ability to rationally understand. In contrast, the plea is knowing if the defendant actually understands the proceedings. Godinez, 509 U.S. at 401 n. 12, 113 S.Ct. 2680. Thus, the expert opinions that Deere understood the proceedings also demonstrate that Deere’s plea was knowing.

. Deere's claim that the trial judge should have sua sponte held a competency hearing in 1982 fails because there was no evidence of his incompetence before the trial judge. Judge Metheny, the prosecutor and Mr. Jones all believed that Deere was competent. Deere’s actions in court established that he understood the charges, understood the possible sentences, had extensively discussed his case with counsel, could state a factual basis for the plea, understood the rights he was waiving and could consult with counsel. He also gave rational reasons for pleading guilty and waiving a jury trial and his constitutional rights. Finally, the court-appointed psychiatrist found Deere competent, and both counsel stipulated to that competence finding. The trial court was entitled to rely on the competency determination. Wallace v. Stewart, 184 F.3d 1112, 1118 (9th Cir.1999). The record before the trial judge simply did not raise a bona fide doubt about Deere’s competence to warrant a sua sponte hearing.
Deere’s claim that he was actually incompetent to plead guilty and stand trial fails because the state court's multiple, repeated competence findings are well-supported by the record. The new evidence, which we disfavor, simply does not provide the clear and convincing evidence necessary to overcome all of the evidence establishing that Deere was competent in 1982 and 1986.

. Deere, 280 Cal.Rptr. 424, 808 P.2d at 1187 n. 4.

. Judge Metheny stated:
You might say what was committed here certainly was not an extensive crime. It had to do with an emotional situation. It has to do with the murder of people knowing one another. You can’t compare it with organized crime ... where somebody was hired to go out and shoot people ...

. THE COURT: ... Can you think of anything sadder you could do to a mother or father — a mother in this case. Losing a husband and two kids?
THE DEFENDANT: No.
THE COURT: Me either. I've thought about that. I’ve thought about it a lot. When you go out and shoot somebody with a rifle — when you’re in the service, it doesn’t hurt you too much because you're told that is right. But stripping away the life of children and a husband from somebody that wasn't directly connected to you, that puts that into the aggravating circumstances to the extent that everything else I say is a bunch of nonsense. If you shot the Judge, it might have been different.

. Deere wanted to depose Judge Metheny, obtain his medical records and subpoena "any relevant records of complaints lodged with the Commission on Judicial Performance between 1982 and 1988 against” the judge.

. The dissent (but not Deere) argues that Judge Metheny exhibited “mental incompetence” at the penalty phase as evidenced by a discussion in which defense counsel requested that the judge rule that the aggravating evidence "outweighed” the mitigating evidence, all before any mitigating evidence was even presented. After Judge Metheny (and the prosecutor) expressed confusion about this request and sought clarification of what defense counsel was really seeking — basically, a ruling that the aggravating evidence was insufficient as a matter of law — Judge Methe-ny denied the request and required the presentation of mitigation, a ruling not disturbed on appeal.

. The remaining claims Deere asserts on appeal were rejected by the district court. We affirm those rulings for the reasons set forth by Judges Taylor and Snyder, respectively.